Argued and submitted October 2, 1995, reversed January 3, 1996

In the Matter of Duane Wesley Strasburger,
Alleged to be a Mentally Ill Person.

STATE OF OREGON,
*Respondent,*

*v.*

DUANE STRASBURGER,
*Appellant.*

(9501-60669; CA A87503)

909 P2d 197

Laurie Bender argued the cause and filed the brief for appellant.

Jas. Adams, Assistant Attorney General, argued the cause for respondent. With him on the brief were Theodore R. Kulongoski, Attorney General, and Virginia L. Linder, Solicitor General.

Before Warren, Presiding Judge, and Edmonds and Armstrong, Judges.

EDMONDS, J.

## EDMONDS, J.

■       Appellant appeals an order finding him to be a mentally ill person and committing him to the Mental Health Division for treatment. The order is based on the trial court's findings that appellant is dangerous to himself and is unable to provide for his basic needs. ORS 426.005(1)(d).[1] Appellant contends that the findings are not supported by clear and convincing evidence as required by ORS 426.130. We review *de novo, State v. O'Neill*, 274 Or 59, 545 P2d 97 (1976), and reverse.

Appellant was released from the Oregon State Hospital (OSH) in Salem on October 19, 1994, after being treated there for ten years. After leaving OSH, appellant moved to his parents' home in Centralia, Washington. After his discharge from OSH, appellant discontinued his prescribed medications because, according to him, they do not affect the voices he hears. In January 1995, he set out for Salem. Appellant testified that he was going to Salem because "voices" told him to go there to seek out a woman he had met at OSH in 1991.

Appellant traveled from Centralia to Portland by bus. He spent a couple of days on Burnside Street in Portland. When appellant departed from Centralia, he left behind his checkbook and wallet. Appellant receives approximately $900 per month in Social Security Disability (SSD) income, which is directly deposited into his bank account in Washington. At his commitment hearing, appellant testified that he does not want the money that is in his account. Instead, he intends to live by "the good will of the people." His philosophy resulted in him coming in contact with the Portland police. Appellant testified:

"I needed food, I needed water. My feet were, I'm walking on pain. I couldn't go no further. I stood there, I looked at a motel, I looked at a restaurant, and I stood there and I was trying to decide where I was going to go. I said: Well, I better

---

[1] ORS 426.005(1)(d) provides:

"(d) 'Mentally ill person' means a person who, because of a mental disorder, is one or more of the following:

"(A) Dangerous to self or others.

"(B) Unable to provide for basic personal needs and is not receiving such care as is necessary for health or safety."

·

go get something to eat. So I went to the restaurant and I sat down, and I just barely able to talk enough to order some water. And, then I sat there for, oh, half an hour. I don't know how long at the time. But anyway, after I got done eating, you know, I had a recipe for a meal that I had made up. I wrote it down on a piece of paper, and I said: Here, I'll trade you this recipe for a meal I ate. They wouldn't do it. I got mad. I throwed [*sic*] it on the counter, walked out the door, and the waitress came and got me and sat me down and called the cops for some reason. They would have made a million off that recipe. It was a good recipe."

As a result of that incident, appellant was placed at the Portland Adventist Medical Center (PAMC) and remained there until his commitment hearing on January 30.

At the hearing, Leo Pothetes, a commitment investigator, testified regarding the interviews that he had with appellant. Pothetes' report was also admitted into evidence. Pothetes testified that appellant was "courteous and responsive" during the interviews. However, appellant also told Pothetes that he hears voices and that they direct his actions at times. When Pothetes asked whether the voices told him to harm himself or others, appellant did not answer. Appellant also told Pothetes that he enjoys alcoholic beverages, has used amphetamines and would like to try cocaine. Pothetes noted that appellant's mood was "labile" during the interviews and that appellant would become angry, and swear at the police and PAMC staff, and then would return to a more serene state. Pothetes opined that appellant suffers from a "schizoaffective" disorder and displays poor insight and judgment regarding the treatment of his illness. Pothetes concluded that appellant is a danger to himself and others and is unable to care for his basic needs.

At the hearing, appellant was questioned by two examiners, Dr. Susan Mayer and Sara Sheets. During the questioning, appellant conceded that he suffers from a mental illness. He also insisted that he does not wish to take medications. Throughout the questioning, appellant referred to his dislike of money and to his belief that money causes stress, mental problems and is the "*root of all evil.*" Appellant described his plan to share his beliefs with others by talking to them about problems with money.

Regarding his ability to care for himself, appellant testified that in the past he had obtained food by sharing his beliefs with others and that he did not intend to rely on his monthly income from SSD, but rather to exchange his knowledge about money for food and shelter. When asked about his ability to obtain food and shelter in the future, appellant testified:

"Q   Tell me if you were out in the community and needed to get food again, how would you go about doing it?

"A   I guess I'll have to rake a yard or stack some firewood or something. I used to do it at one time.

"Q   Oh.

"A   I don't know if we can do it any more.

"Q   What is the reason that you wouldn't try to get this money from your S.S.D. fund?

"A   I don't like money. I don't want money. No good. Absolutely. * * *"

Appellant also testified regarding his attitude towards others.

"Q   What if it doesn't work out for you to be going around asking for food and shelter?

"A   Well, it don't [sic] work out for me, maybe I can educate the people someway or another.

"Q   What if someone really objected to that and said just don't say a word more?

"A   That's their choice.

"Q   Would they get in a fight with you?

"A   No, that's their choice. They can choose to listen or not to. I don't make them listen.

"* * * * *

"Q   Have you ever got mad enough to hurt someone?

"A   No."

Appellant was also asked:

"Q   Have you felt like hurting yourself in any way in the past few days or past few weeks?

"A   No.

"Q   No? Okay. How about other people?

"A   Well, now, I — just in my mind only, I got fed up with trying to teach people something, tell them what I know, and

then my mind, kind of a picture, you know, television picture. My eyes were turning kind of yellow, and I was going for the throat. In my mind only. You cannot persecute a person for what they think in their mind. There's no way you can. If you can, boy, I'm going to stick every one of you in the penitentiary for doing something like that.

"Q   Okay. So you — you were having thoughts about choking somebody?

"A   That's all. I have had thoughts about suicide, too, when I was down at OSH. I got started on them and I couldn't quit. I didn't like it in there. I wanted out. Suicide was one way out."

In her report, Mayer wrote that appellant is:

"Presently not in contact with current reality regarding the Capitalist System. He admits to being 'mentally ill as long as he can remember,' hearing voices, having mental telepathy with his brother. He has no appreciation of his dilemma. * * *

"The only factor that would bring him to harm is his refusal to engage in the money system and his avowed declaration to burn or give away the SSD funds he has in a bank in Centralia. He will run into difficulty the next time he has need of food [and] shelter. He is, to this extent, unable to care for himself. He does require medication [and] it is unknown to what extent his delusional system, voices etc. responds to medication."

Mayer concluded that appellant suffers from a mental disorder and is unable to provide for his basic needs. However, Mayer also said that appellant is not dangerous to himself or to others.

In her examiner's report, Sheets said:

"[Appellant] states he hears voices telling him to do things. He states he receives SSD of about $900.00 a month but does not want to use money anymore. He states he is starting something new by informing people they don't need to use money. He indicates he would try to ask people to give him things in order to get food and shelter. [Appellant] believes he is informing people about a new way to do things. He states he has done nothing causing his present situation even though he left a restaurant without paying * * * for it. He believes other people cause his problems. [Appellant] said he would not take medications and does not believe he has a mental health problem."

Sheets concluded that appellant suffers from a mental disorder and is unable to provide for his basic needs. She also determined that appellant is not dangerous to himself or others.

Before making its ruling, the trial court asked Mayer:

"Dr. Mayer, you concluded that [appellant] is able to meet his basic needs. Would you tell me why you say that?

"MS. MAYER:   Because I think people are kind hearted to the extent that he can keep himself fed at least on a temporary basis, soup kitchens and so forth. But I think he is going to run into difficulty when people start refusing to listen to his philosophy about money, and I think it could bring him into real conflict with people. And I think things can get quickly out of hand.

"THE COURT:   Okay. Neither of you think he is a danger to others.

"MS. SHEETS:   I didn't see that we had any evidence showing that he was dangerous to others today."

The court found that appellant is suffering from a mental disorder and is unable to meet his basic needs and that he is a danger to himself.

On appeal, appellant argues that the trial court's findings that he is unable to care for his basic needs and is a danger to himself are not supported by clear and convincing evidence. There is no evidence that makes it highly probable that appellant is a danger to himself. We therefore turn to appellant's argument that there is not clear and convincing evidence that he is unable to care for his basic needs.

Basic needs are those things necessary to sustain life. *State v. Brungard*, 101 Or App 67, 71, 789 P2d 683, *mod* 102 Or App 509, 794 P2d 1257 (1990), *rev den* 311 Or 427 (1991). We look at the *existing* conditions in order to determine if an individual can meet his or her basic needs. *State v. Stanley*, 117 Or App 327, 843 P2d 1018 (1992). In *State v. Bunting*, 112 Or App 143, 826 P2d 1060 (1992), we said:

"The legislature's 'basic needs' commitment standard focuses on the capacity of the individual to survive, either through his own resources or with the help of family or friends.

"'* * * * *

"A person is subject to a 'basic needs' commitment under ORS 426.005(2)(b) if clear and convincing evidence demonstrates that, due to a mental disorder, there is a likelihood that the person probably would not survive in the near future because the person is unable to provide for basic personal needs and is not receiving care necessary for health or safety." *Id.* at 145-46.

This is a close case that is controlled by the burden of proof standard. The state must demonstrate that it is highly probable that appellant is unable to provide for his basic personal needs because of his mental disorder. Appellant came into contact with the police because of his personal philosophy about the use of money. Although the facts of this case provide some evidence that appellant's mental disorder affects his ability to provide for his basic needs, a difference in personal philosophy about the use of money or any other difference in personal beliefs from that held as the "perceived norm" of society by others is not a *per se* basis on which an involuntary commitment may be made. It is uncontradicted that appellant possesses the assets with which to provide for his basic needs, should he choose to employ them, and that he recognizes the necessity of some activity on his part to provide for his survival, *i.e.*, yard work, stacking firewood or depending on the good will of other people. Even though the examiners believe that appellant's mental disorder has contributed to his choice of lifestyle, that does not mean that he is unable to meet his basic needs and therefore is subject to involuntary commitment. Rather, the statute requires proof by clear and convincing evidence that his mental disorder has rendered him unable to provide for his basic needs under the existing conditions.

Because the statute requires more than a showing that a mentally ill person holds a different value system which he or she seeks to live out, the trial court erred.

Reversed.