Argued and submitted January 13, reversed March 19, 1997

In the Matter of Maxine Gjerde,
Alleged to be a Mentally Ill Person.

STATE OF OREGON,
*Respondent,*

*v.*

MAXINE GJERDE,
*Appellant.*

(960463124; CA A93026)

935 P2d 1224

Laurie Bender argued the cause and filed the brief for appellant.

Robert E. Sabido, Assistant Attorney General, argued the cause for respondent. With him on the brief were Theodore R. Kulongoski, Attorney General, and Virginia L. Linder, Solicitor General.

Before Deits, Presiding Judge, and De Muniz and Haselton, Judges.

HASELTON, J.

## HASELTON, J.

Appellant seeks reversal of an order adjudicating her to be a mentally ill person and committing her to the Mental Health Division. ORS 426.130(1)(b)(C). She asserts that the state failed to prove, by clear and convincing evidence, that, because of a mental disorder, she was either a danger to herself or was unable to provide for basic personal needs. ORS 426.005(1)(d)(A) and (B). On *de novo* review, *State v. O'Neill*, 274 Or 59, 61, 545 P2d 97 (1976), we conclude that the state failed to prove the necessary causal connection between appellant's alleged mental disorder and her determination to return to her home rather than agree to placement in a nursing home. Accordingly, we reverse.

Appellant is a feisty, self-reliant 61-year-old woman. On April 11, 1996, appellant, who has a history of heart and lung impairment, came to Portland Adventist Hospital because she had been experiencing chest pains and had blood in her phlegm. Appellant, who had lived by herself for many years, had experienced several bouts of pneumonia since early 1992, with the most recent occurring in August 1995. Because of her diminished heart and lung capacity and the related impairment of the flow of blood and oxygen to her brain, appellant had been supplied with portable oxygen equipment and had used that equipment in her home from November 1994 through October 1995.[1] It appears that, despite her physical impairments, appellant was generally self-sufficient, handling her own cooking and shopping, going out for occasional walks, reading, listening to music, and following current events.

When appellant was admitted to Portland Adventist, her blood oxygen content and blood sugar level were "dangerously low." She was suffering from, and was treated for, pneumonia, diabetes, and alcohol withdrawal.[2] She was given oxygen via a nasal catheter, and her treating physician

---

[1] The record does not disclose why appellant discontinued her use of oxygen in October 1995, though she did testify that her lung congestion would periodically "clear up."

[2] Appellant had a history of heavy drinking. Most recently, she had stopped drinking wine and beer and had, instead, consumed three to four ounces of mouthwash a day as a substitute source of alcohol.

prescribed medication, which appellant initially resisted but eventually agreed to take.

Within a day or two after appellant's admission to the hospital, her treating physician and other medical staff told her that they believed that she needed to be placed in a nursing home, so that her condition could further stabilize. Appellant adamantly refused. She strongly expressed her suspicion and distrust of hospital staff—and the medical community in general—and rejected any alternative, other than returning directly to her home within a few days. Hospital staff, including physicians, believed that if appellant returned directly home, without a nursing home placement, or if she did not cooperate in taking the prescribed medication and oxygen, her life would be in danger. They were particularly concerned that, if appellant discontinued her oxygen use while alone at home, she would become so confused as to be unable to obtain necessary treatment in the event of an emergency.

Because of those concerns, and particularly appellant's continued resistance to even temporary placement in a convalescent facility, a staff psychiatrist filed a notification of mental illness that described appellant as "paranoid, confused" and stated that appellant "demanded to leave and is unable to understand the serious nature of her condition." At the ensuing civil commitment hearing, on April 19, hospital personnel testified about their concerns about appellant's adamant refusal to agree to a nursing home placement. Dr. Truax, the psychiatrist, testified:

> "[I]f Maxine could have agreed to go to a convalescent facility, it's possible that after a period of one to several weeks, she might improve enough to go back home. Uh, if she is committed at this point, I would be inclined that we admit her for a week to the psychiatric unit to work with her. The medical doctor feels he's gone as far as he can at this point.
>
> "* * * * *
>
> "Another way to do it would be to have her go to a convalescent facility or nursing home. If we admit her to psychiatry here, we would have coordination with the internal medicine people, which I think would be in her best interest. We've been treating her."

Appellant also testified at length about her life style, her physical condition, and her perception of her abilities to deal with her condition at home, without a nursing home placement. *See* 147 Or App at 194-95 (recounting testimony).

One examiner described appellant's mental condition as "Depression-Organic Delusional [D]isorder[3] with Alcohol Abuse, Chronic," and opined that appellant was both dangerous[4] to herself and unable to provide for her basic needs. The other examiner offered no diagnosis of appellant's mental condition but opined that appellant was unable to meet her basic needs. The trial court concluded that appellant should be committed on both "basic needs" and "dangerous to self" grounds.

■■ On *de novo* review, we examine the record to determine whether the state has established by clear and convincing evidence that, because of a mental disorder, appellant is either unable to provide for her basic needs or is a danger to herself. *State v. Johnson*, 131 Or App 561, 564, 886 P2d 42 (1994). To be "clear and convincing," evidence must be of " 'extraordinary persuasiveness.' " *Id.* (quoting *State v. Siebold*, 100 Or App 365, 366, 786 P2d 219 (1990)). We conclude that the state failed to meet that burden.

■ ORS 426.005(1) provides, in part:

"As used in ORS 426.005 to 426.390, unless the context requires otherwise:

"(d) 'Mentally ill person' means a person who, *because of a mental disorder*, is one or more of the following:

---

[3] There was no testimony at the commitment hearing as to the meaning or content of "organic delusional disorder," and the examiner did not describe the attributes of that disorder in his report. And the DSM-IV lists "delusional disorder" as including a "persecutory" subtype but does not refer to "organic delusional disorder." *See* American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders § 297.1, pp. 296-301 (Fourth ed 1994). The examiner's reference to "organic delusional disorder" would seem to refer to a delusional disorder resulting from organic cause. However, the diagnostic criteria for "delusional disorder" specify that "the disturbance is not due to the direct physiological effects of a substance (*e.g.*, a drug of abuse, a medication) or a *general medical condition*." *Id.* at 301 (emphasis supplied).

[4] The first examiner's "dangerous to self" opinion was based on his conclusion that appellant's "ability to meet her needs—even broadly considered, is so limited and so much so she may even be deemed to pose real danger to herself."

"(A)   Dangerous to self or others.

"(B)   Unable to provide for basic personal needs and is not receiving such care as is necessary for health or safety." (Emphasis supplied.)

The statute expressly requires that there be a causal connection between the alleged mental disorder and the danger to self or inability to meet basic needs. *See, e.g., State v. Jacobson*, 142 Or App 371, 376, 922 P2d 670 (1996) (affirming order of commitment where appellant was unable to obtain necessary medical treatment because of his mental disorder, chronic alcoholism: "Appellant says he wants to stop. However, *because of his condition*, he has simply been unable to do so." (Emphasis supplied.)). Thus, it is not sufficient for the state merely to prove that a person has a mental disorder and that the person is dangerous to others, is dangerous to himself or herself, or is unable to provide for basic needs. Rather, the state must prove a causal nexus between the mental disorder and at least one of the ORS 426.005(1)(d) criteria. We conclude that, in this case, the state failed to establish the requisite nexus by clear and convincing evidence.

Appellant argues, first, that the state failed to prove that she was suffering from a mental disorder, particularly organic delusional disorder, depression, and/or chronic alcoholism. We do not address that argument, because, even if we were to assume that appellant has one or more of those disorders, the state failed to prove that appellant's determination to return to her own home, rather than be placed, even temporarily, in a nursing home, was the product of a mental disorder.

As noted, hospital personnel testified at length concerning appellant's medical condition, her initial confusion and noncooperation with respect to medication and oxygen, her adamant refusal to acquiesce in a nursing home placement, and her deep suspicion and distrust of hospital personnel and the general medical community. *See* 147 Or App at 190-91. However, none of the state's witnesses, including the psychiatrist, Truax, linked appellant's resistance to a nursing home placement to a mental disorder.[5] Indeed, as Truax

_____

[5] Truax did not testify as to any diagnosis of a mental disorder—and, particularly, did not explain or expand on his reference to "paranoia" in the original

acknowledged on cross-examination, appellant had come to Portland Adventist for medical care on her own initiative.

Conversely, appellant's testimony at the commitment hearing was generally lucid and compelling. Appellant began by explaining why she had not fully cooperated in taking prescribed medication:

"Q   [By Examiner McWhirter] When you first came in the hospital it sounds like you were pretty suspicious of all of them and you hadn't been on any steroids [for treatment of her pulmonary condition] at all.

"A   No. No. I was because I've had bad—bad experiences at this hospital before, and it made me very fearful.

"Q   Uh-huh. What do you think they were trying to do?

"A   I don't know. The most of the time what they do is they just ignore anything I say. And that's a very frightful position to be in when you have no family or no one to look out for you.

"Q   Uh-huh. Since you—since you've been here, has the treatment been satisfactory, this time?

"A   No. I wouldn't say so. Uhm, one thing is the jumping around of the medicines. Like this morning, I wouldn't have had to been ill if you don't come in and—and—and give me a handful of medicines to take. And—and—and then my stomach goes nuts and my blood sugar goes crazy and—and I have to go through a period of pure hell before I'm out of it again, ya' know. And I just figure it's—it's carelessness. That is what this is. It's a lack of care and control. It's—is what's—is what's going on. Uh, there's no reason to give a person seven or eight pills in a row, uh, by the handful when you could distribute them over a matter of hours.

"Q   Sounds like that's what they did; distribute 'em over—over hours.

"A   No, they did not until I demanded that they do that.

"Q   Uh-huh.

notification of mental illness. He did not, for example, testify that plaintiff was suffering from organic delusional disorder, much less that such a disorder would impair appellant's assessment of the risks and benefits of possible treatment and care, including a nursing home placement.

"A   And, of course, anytime I demand anything then I'm supposed to be mentally ill."[6]

Appellant then explained that she had used oxygen in her home before and that she felt that, after a few more days in the hospital, she would be ready to return home:

"Q   [By Examiner McWhirter] You heard the doctor and you heard the social worker talk about, you know, in this day and age, they only keep you in the hospital for acute care —

"A   Yeah.

"Q   — and then you have intermediate care after that and then hopefully you get strong enough to go back home. Now, what did you think of this planning and this thought which they had?

"A   Well, no. I don't agree with it because I know that I can go home and take care of myself. Like today I—I used—done the bathroom route thing four times myself. I've sat in a chair and exercised myself. And this is without anyone's help, you know. And so, consequently, I know that I'm getting closer to a stage where I'll be able to —I'll be able to do my own thing again. I—I don't need to —

"Q   So, you feel you are getting stronger?

"A   Oh, yeah.

"Q   Could you handle the oxygen tank and hook it up and that sort of thing?

_____

[6] In a similar vein, appellant testified:

"Q   [By Examiner McWhirter] It seems you told the examiner that—that at one time you believed you'd been drugged, poisoned, and hypnotized. Was that here in this hospital?
"A   I have been hypnotized —
"Q   You have?
"A   — in this hospital.
"Q   In this—in this hospital?
"A   Oh, yeah.
"Q   And what do you think they were trying to accomplish?
"A   Post-hypnotic suggestion. Works very handily with mental patients.
"Q   To make you think what?
"A   To make you think whatever they want you to think."

"A   Oh, that's—that's no problem 'cause you do—you have leader—leader lines, long lines, and you just string 'em all over the apartment and hope that you don't break your neck when you're gettin' around because, you know, they're all over the floor and everything. But, no, they—no, that—that's no problem, you know. And like Tri-Met lift drivers have been—they're very—they're very helpful. They're very helpful.

"* * * * *

"Q   You wouldn't consider at all the—the hospital's plan for you for the next few weeks?

"A   No. I don't want to go to a—to a nursing facility. I just don't want to at all. And you gotta remember that for most of my life I—I've lived by myself. And I don't know—maybe it's egotistical, but I enjoy living by myself.

"Q   Right.

"A   You know, I—I—I enjoy my books and music and TV and walks and stuff like that. And I don't know how to explain it to you, but if—if you've been alone for most of your life, you—this is your pattern of life, you know."[7]

Finally, appellant reiterated her reasons for wanting to return to her home:

"Q   [By Examiner Erickson] But you don't think it's necessary to spend a week or so in a nursing home or some other less restrictive facility than the hospital before you go home?

---

[7] Another colloquy between Examiner McWhirter and appellant exemplified appellant's self-reliance:

"Q   [By examiner] * * * I was just wondering, does it ever get pretty hopeless? Do you ever get to feeling pretty hopeless?
"* * * * *

"A   — it depends on what I do. If I find that—like, see, going out to get the mail is something I have to do because we have little locked boxes, and it can't sit in there very long. And I'm worried about it right now. If you don't, they take it all back to the post office, you know. But anyway, no. Just to get out and walk and be with nature—even if it's raining, you know, and stuff like—I get a lot of enjoyment out of—out of being independent.
"* * * * *

"Q   The doctor described that as heroic. Do you —
"A   No. That's not heroic. That's just—that's just good for you, that's all."

"\* \* \* \* \*

"A   No. But once—once—you see, another thing, I don't get any sleep in the hospital to speak of at all. So I don't get any rest. And once I get home, I—I will be able to get some rest. There'll be some quietness and—and —

"Q   Have you ever—have you ever been in a—in a medical nursing home which is—which is kind of a half step between hospital and home?

"A   I—I—I used to be a case worker, so I visited them, so I know from where I speak."

Appellant's testimony evinces a free, knowing, and rational choice to return home, notwithstanding the attendant risks. It is not necessarily the choice that everyone would make. But it is appellant's choice. And it is not the state's prerogative under the civil commitment statutes to interfere with that choice. *See State v. Strasburger*, 138 Or App 409, 416, 909 P2d 197 (1996) ("[A] difference in personal philosophy about the use of money or any other difference in personal beliefs from that held as the 'perceived norm' of society by others is not a *per se* basis on which an involuntary commitment may be made."). Unless a mental disorder has impaired autonomous choice, civil commitment cannot be a vehicle for "saving people from themselves."

Reversed.