Argued and submitted May 11, reversed July 22, 1998

In the Matter of Beverly White,
Alleged to be a Mentally Ill Person.

## STATE OF OREGON,
*Respondent,*

*v.*

## BEVERLY WHITE,
*Appellant.*

(M97-09-03; CA A99485)

963 P2d 107

Gay Canaday argued the cause and filed the brief for appellant.

John T. Bagg, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before De Muniz, Presiding Judge, and Deits, Chief Judge, and Haselton, Judge.

HASELTON, J.

## HASELTON, J.

Appellant Beverly White seeks reversal of an order adjudicating her to be a mentally ill person and committing her to the Mental Health Division. ORS 426.130(1)(b)(C). She asserts, *inter alia*, that the state failed to prove by clear and convincing evidence that, because of a mental disorder, she was unable to provide for basic personal needs. ORS 426.005(1)(d)(B). On *de novo* review, we conclude that, although appellant has a mental disorder, the state failed to prove that, because of that disorder, she was unable to provide for her basic needs. Accordingly, we reverse.

Appellant is 50 years old. At all material times, up to the commitment hearing on September 16, 1997, appellant periodically experienced delusions that "machines" or jewels" had been surgically implanted in her body, that she had been "cloned" and not born, and that she was of royal lineage. Appellant also consistently expressed delusional somatic complaints, including burning sensations in the extremities and pain of the internal organs: "When my stomach starts moving without me wanting it to, then it causes confusion. And then I go into mass hysteria. I don't like to be touched from the inside." Appellant has no history of substance abuse and has never threatened, or committed, violence towards herself or others.

The record is somewhat unclear as to appellant's living situation before early June 1997. It appears, however, that immediately before that time, appellant had been homeless, living out of her van, and working odd jobs.[1] In her words, "I'm always in a tough spot, but I've tried to work my way out." Appellant, who maintained insurance on her van, had never applied for, or received, public assistance.

In June 1997, appellant saw a "help wanted" sign at the home of Doreen Bryant, who operates a state-certified adult foster care home in Clackamas. Appellant performed yard work for Bryant for a couple of days and, thereafter,

---

[1] Appellant previously lived with a sister in Gresham for two years. Except for that relationship, she apparently had no contact with her family.

Bryant offered to let appellant stay in a trailer on her property, performing yard work and household chores in return for room and board. Appellant stayed with Bryant for approximately three months, until early September, living in the trailer, eating on a regular basis with Bryant and the home's residents, and, with occasional prompting, maintaining appropriate hygiene. Appellant would sometimes relate her delusions to Bryant, but the delusions did not interfere with her work or her general abilities to function and interact with Bryant.[2]

In early September 1997, appellant's somatic complaints apparently worsened: "My stomach was so rotted inside. It felt like something was biting upon me and chewing upon me." Consequently, appellant, on her own initiative, went to the Crisis Triage Center at Providence Hospital and asked that the "machines" in her body be surgically removed. Medical staff, concerned about appellant's delusions, initiated the commitment process and prescribed medication (Haldol), which appellant described as "nourishment for the brain."[3] Appellant was subsequently transferred to Portland Adventist Medical Center.

At the commitment hearing, the precommitment investigator recounted appellant's delusions and associated somatic complaints, stated that appellant suffered from a "schizophrenic thought disorder," and concluded that, because of her "disorganized state of mind," she would not be able to care for herself and was in need of continued hospitalization. The investigator was particularly concerned about appellant's lack of a "concrete plan" but acknowledged that she (the investigator) was "unclear" about appellant's living situation with Bryant. The investigator also acknowledged that appellant had voluntarily sought treatment, that she was willing to voluntarily stay in the hospital, and that "she has been compliant with the medications."

---

[2] Bryant testified, "No, this is just something she believes. And usually, when I talked to her, usually that came about when I was asking personal questions. And after we'd talked just a little bit, it didn't go anywhere, so we just stopped."

[3] Although appellant had been treated previously at the Crisis Triage Center in April 1997, the record is unclear about the treatment afforded and, particularly, about whether any medication was prescribed on that occasion.

Appellant also testified. She described her delusions—reiterating that she still felt like she had machines inside of her—and also stating that, "if I take the pills, they stop." Although appellant denied that she had a mental disorder and seemed to believe that the medication addressed a *physical* condition, she repeatedly and lucidly stated that she would continue to take her medication and would accept "help," including seeing a therapist or counselor. Appellant also testified that she would be willing to return to Bryant's and that she believed that she could manage her basic needs "if I'm working with Doreen."

Finally, Bryant testified. She stated that she would welcome appellant back "but * * * that [appellant] really need[s] to get some help." Bryant said that, if appellant was agreeable to taking her medication and going to outpatient care, she would help make sure that appellant took her medication and would assist her in attending counseling sessions.

The two examiners were divided in their recommendations. One examiner described appellant's mental condition as "schizophrenia, disorganized type" and concluded that "her judgment and insight into the reality of having a mental illness are diminished to the extent of her being unable to provide for her basic needs." The other examiner diagnosed "psychosis acute [not otherwise specified], basically in moderate remission" and concluded that appellant "at present, this date, seems sufficiently organized to care for herself but needs help-support."

The trial court concluded that appellant had a mental disorder, was unable to provide for her basic needs, and was not willing and able to participate in treatment on a voluntary basis. The court observed:

"I don't think the program that will be to your benefit has been established yet and that will take a few days here in the hospital to establish that. So we're going to keep you in the hospital, Ms. White * * *.

"But as soon as you get leveled out, why then you can be released and go back to Ms. Bryant's place or where ever else. * * * And Ms. Bryant will help you. She said she'd help you pursue those things. So you stay here for a few days or

whatever time it's going to take, Ms. White, until you're ready to be discharged."

■ Appellant challenges each of the trial court's predicate determinations—*i.e.*, that she has a mental disorder, that because of that disorder she cannot provide for her basic needs, and that she would not cooperate in treatment. We conclude, without further discussion, that the state proved that appellant suffers from a mental disorder. However, we agree with appellant that the trial court erred in determining that appellant was unable to provide for her basic needs. Consequently, we reverse on that basis.[4]

■ ORS 426.005(1) provides, in part:

"As used in ORS 426.005 to 426.390, unless the context requires otherwise:

"* * * * *

"(d) 'Mentally ill person' means a person who, because of a mental disorder, is one or more of the following:

"* * * * *

"(B) Unable to provide for basic personal needs and is not receiving such care as is necessary for health or safety."

Under that statute, the state is required to prove, by clear and convincing evidence, that there is a "causal nexus" between the mental disorder and the alleged inability to meet basic needs. *State v. Gjerde*, 147 Or App 187, 192, 935 P2d 1224 (1997). The state failed to meet that burden.

Appellant was providing for her basic needs before seeking treatment at Providence in September 1997. She had food, shelter, and clothing, was occasionally earning income, and, with periodic prompting, was maintaining appropriate hygiene. Indeed, it appears that, even before appellant met Bryant in June 1997, she was meeting those needs in her own way, living in her van and earning income from odd jobs. Although appellant obviously suffered from delusions, there

---

[4] Given that disposition, we do not reach appellant's alternative argument that appellant "is willing and able to participate in treatment on a voluntary basis" and "will probably do so." ORS 426.130(1)(b)(A)(i)-(ii).

is no evidence in this record that her inability or unwillingness to acknowledge her condition prevented her from addressing basic needs—for example, there is no evidence of severe weight loss or refusal to take medication to address a life-threatening condition—or placed her in "harm's way."[5] Indeed, despite her delusions, appellant voluntarily sought treatment at Providence.

Similarly, the state failed to prove that, upon her release, appellant would be unable to provide for her basic needs. Bryant was prepared to continue her arrangement with, and to assist, appellant, and appellant was prepared to return to Bryant's home. Thus, even if we were to assume that appellant could not, by herself, care for her basic needs, Bryant's support was the functional equivalent of the support the parents afforded in *State v. Gill*, 120 Or App 543, 547, 853 P2d 304 (1993) ("Whether appellant is capable of caring for her basic needs depends on her capacity to survive, either through her own resources or with the help of family or friends.").

■    We reiterate our admonition in *Gjerde*: Civil commitment is not a paternalistic vehicle for "saving people from themselves." 147 Or App at 196. Appellant is, unquestionably, delusional; her lifestyle is, at least by some lights, unconventional. But despite her disorder, she gets by—on her own terms. Because the state failed to prove the requisite causal nexus under ORS 426.005(1)(d)(B), the court erred in committing appellant.

Reversed.

---

[5] *See, e.g., State v. Bunting*, 112 Or App 143, 826 P2d 1060 (1992); *State v. Brungard*, 101 Or App 67, 789 P2d 683, *mod* 102 Or App 509, 794 P2d 1257 (1990), *rev den* 311 Or 427 (1991). *Accord State v. Sea*, 137 Or App 333, 337-38, 904 P2d 182 (1995) (reversing "basic needs" commitment where evidence disclosed "no meaningful reference for the significance of the loss of ten pounds over a period of several months" and where there was "no evidence that appellant has failed to seek medical treatment when necessary").