Argued and submitted October 15, reversed December 15, 1999

In the Matter of Mary Ann DeMartino,
Alleged to be a Mentally Ill Person.

STATE OF OREGON,
*Respondent,*

*v.*

MARY ANN DEMARTINO,
*Appellant.*

(C980119MC; CA A103794)

991 P2d 1093

Lissa Kaufman argued the cause for appellant. With her on the brief was Greg Scholl.

Denise Fjordbeck, Assistant Attorney General, argued the cause for respondent. On the brief were Hardy Myers, Attorney General, Michael D. Reynolds, Solicitor General, and John T. Bagg, Assistant Attorney General.

Before Haselton, Presiding Judge, and De Muniz* and Wollheim, Judges.

DE MUNIZ, J.

---

* De Muniz, J., *vice* Warren, S. J.

## DE MUNIZ, J.

Appellant appeals an order finding her to be a mentally ill person and committing her to the Mental Health Division for treatment. The order was based on a finding that appellant suffers from a mental disorder, is unable to provide for her basic personal needs, and is not receiving such care as is necessary for her health and safety. ORS 426.005(1)(d)(B). Appellant contends that the court's findings that she is unable to provide for her basic needs and that she would not participate in treatment on a voluntary basis are not supported by clear and convincing evidence, as required by ORS 426.130. On *de novo* review, *State v. O'Neill*, 274 Or 59, 61, 545 P2d 97 (1976), we reverse.

In August of 1998, appellant's mother and brother came to her home and found that there were many bags of garbage in the garage, as well as mice in the house. There also were numerous unpaid bills. Appellant was behind in the mortgage payments on her house. She was behaving erratically, throwing things around, and apparently had had a recent verbal confrontation with her sister. Appellant's son called the police and had appellant hospitalized. Appellant's brother called her employer and reported that she was ill. Appellant had not previously been hospitalized.

Appellant's mother testified at the hearing that appellant had been acting odd for several months, continually rearranging her furniture, washing dishes and clothes, and cutting her hair with toenail clippers. Mother also testified that, on one occasion when she was in appellant's car with her, appellant drove erratically. Mother further testified that the food in appellant's refrigerator was rotten and that mother brought food to appellant. Mother also testified that appellant put out traps for the rodents in her home. Finally, mother testified that appellant had been seeing a psychiatrist for at least six months and had been taking her prescribed medications.

Appellant's son testified that there was no food in appellant's house other than that brought by her mother, but

he also testified that appellant had bought groceries for herself at one point. He testified that appellant was seeing a psychiatrist of her own choice, but that he wanted her to see a different psychiatrist. He testified that, in August 1998, he found broken glass in a spare bedroom in appellant's home. He testified that he disapproved of the fact that appellant spent money on a traveling steam iron and an emergency road kit because he did not believe that she had enough money to travel anywhere. He testified that appellant had told him that angels would provide for her. After appellant was involuntarily committed, her son removed the furniture from her house without her permission and transferred it into appellant's mother's house because he wanted to rent out appellant's house in order to pay her bills.

Appellant apparently was released from the hospital shortly after her initial commitment on August 18. Details concerning her release were not made part of the record in the present proceeding. At some point in September 1998, her family apparently again had her hospitalized involuntarily, which ultimately led to the commitment proceeding at issue in this case. The record contains no testimony pertaining to the reasons for the September hospitalization.

At the hearing, appellant testified that she had been under the care of both a psychiatrist and a psychologist for the previous six months and that she was taking her prescribed medications, including lithium. She testified that she understood that she had had a manic episode and that she would continue to take the medications prescribed by her doctors. She testified that she had bought and prepared food for herself before being hospitalized and that she planned to continue to do so if released. She testified that she often ate out, particularly when she was working. She testified that she worked as a child development specialist at Head Start and that she loved her work. She testified that the spare room in which the glass had been found was closed off and unused. She testified that her spiritual beliefs included belief in angels and that she prayed to them, but that she understood that her bills would need to be paid from her paycheck. She testified that she would like to return home.

The two mental health examiners who assisted the court in the course of the hearing both indicated that they believed that appellant suffered from a mental disorder and was not able to provide for her basic personal needs and was not receiving such care as was necessary for health and safety. Both noted that appellant was alert and appeared to be well-nourished or stout. Both formed a diagnostic impression that appellant suffered from a bipolar disorder.

After the mental commitment hearing, the trial court found that appellant was a mentally ill person who was unable to provide for basic personal needs and was not receiving such care as was necessary for her health and safety. The court therefore ordered appellant committed to the custody of the Mental Health Division for a period not to exceed 180 days.

On appeal, appellant does not dispute the finding that she suffers from a mental illness. Appellant does contend, however, that the trial court erred in finding that she was unable to provide for her basic personal needs and was not receiving such care as was necessary for her health and safety. On *de novo* review, we agree with appellant.

Although the evidence in the record establishes that appellant suffers from a bipolar disorder and recently had a manic episode, the record falls short of demonstrating either that appellant is unable to provide for her basic personal needs or that she was not receiving the care that was necessary for her health and safety. For the state to satisfy its burden of demonstrating by clear and convincing evidence that appellant is unable to provide for her basic personal needs, it must provide evidence of "extraordinary persuasiveness." *State v. Siebold*, 100 Or App 365, 366, 786 P2d 219 (1990). The state must demonstrate a causal connection between a person's alleged inability to meet basic needs and the person's alleged mental disorder. *State v. Gjerde*, 147 Or App 187, 192, 935 P2d 1224 (1997). It is not the state's prerogative, under the civil commitment statutes, to interfere with a person's choice of lifestyle, even if that choice is not one "that everyone would make." *Id.* at 196. "[A] difference in personal philosophy about the use of money and any other difference in personal beliefs from that held as the 'perceived norm' of

society by others is not a *per se* basis on which an involuntary commitment may be made." *Id.*; *see also State v. Strasburger*, 138 Or App 409, 416, 909 P2d 197 (1996).

Appellant's family was justifiably concerned that her erratic behavior during her manic episode was jeopardizing her financial security and that her decisions were, perhaps, not those that everyone would make and might be outside the "perceived norm" of society. However, the record is entirely lacking in evidence that appellant was, in fact, unable to meet her basic personal needs as that term has been interpreted in our case law. In *State v. Bunting*, 112 Or App 143, 145-46, 826 P2d 1060 (1992), we stated:

> "The legislature's 'basic needs' commitment standard focuses on the capacity of the individual to survive, either through [her] own resources or with the help of family or friends.
>
> "* * * * *
>
> "A person is subject to a 'basic needs' commitment under ORS 426.005(2)(b) if clear and convincing evidence demonstrates that, due to a mental disorder, there is a *likelihood that the person probably would not survive in the near future* because the person is unable to provide for basic personal needs and is not receiving care necessary for health or safety." (Emphasis added.)

Nothing in this record indicates that appellant's ability to survive in the near future was in doubt. Although there was credible testimony that food in appellant's refrigerator was rotting, there is no evidence that she made herself physically ill by eating rotten food or that she was not receiving adequate nourishment. Appellant's mother testified that she brought appellant food, and appellant testified that she bought groceries herself and ate out regularly. That evidence was supported by the observations of the mental health examiners that appellant appeared well-nourished or stout. *Compare State v. Sea*, 137 Or App 333, 904 P2d 182 (1995) (appellant who was reluctant to go to grocery store and had lost 10 pounds should not have been committed based on inability to meet basic needs because there was no evidence that weight loss had affected her health).

Similarly, although the presence of garbage, mice, and unpaid bills in appellant's home demonstrate that she was having some difficulty maintaining her home environment, that evidence falls short of establishing that there was any likelihood that appellant "probably would not survive in the near future." *Bunting*, 112 Or App at 146. Although appellant's family was understandably concerned that she risked losing equity in her home by falling behind in mortgage payments, appellant's inability or unwillingness to make mortgage payments on a home does not indicate a probability that her survival was in question.

The state argues that appellant's lack of insight into the nature of her mental illness demonstrates her inability to meet her basic needs, arguing that, although appellant acknowledges that she is "bipolar," she considers her condition to be a "behavior disorder" rather than a "mental disorder" and would feel better organized if she were able to return to her home and have her furniture returned to her home. We disagree that appellant's statements concerning the nature of her illness demonstrate an inability to meet her basic needs or an unwillingness to seek proper treatment. In *State v. White*, 155 Or App 288, 963 P2d 107 (1998), we determined that the appellant, who was delusional, lived out of a van or in a trailer on another individual's property, worked odd jobs, and occasionally had problems with hygiene, should not have been committed based on her inability to meet basic needs:

> "She had food, shelter, and clothing, was occasionally earning income, and, with periodic prompting, was maintaining appropriate hygiene. * * * Although appellant obviously suffered from delusions, there is no evidence in this record that her inability or unwillingness to acknowledge her condition prevented her from addressing her basic needs—for example, there is no evidence of severe weight loss or refusal to take medication to address a life-threatening condition—or placed her in 'harm's way.'" *Id.* at 293-94.

Similarly here, appellant's understanding—or lack of understanding—of her illness does not reflect any inability or unwillingness to meet basic needs or receive appropriate treatment. Appellant offered uncontradicted testimony that she took her prescribed medications, and that testimony was

confirmed by the very family members who sought to have her committed. Uncontradicted evidence in the record showed that appellant was well-nourished and had planned to continue to eat and had clothing and shelter. We would have to speculate, on this record, that appellant may have been in need of medication other that those prescribed or that she needed adjustments in her medications. Even so, that would not be evidence that appellant was failing to comply with medical treatment. We conclude that the trial court erred in its determination that appellant was unable to provide for her basic personal needs, was not receiving such care as was necessary for her health and safety, and was unlikely to participate in treatment on a voluntary basis.

Reversed.