Argued and submitted April 7, reversed July 30, 2003

In the Matter of Sarn Saephan,
Alleged to be a Mentally Ill Person.

STATE OF OREGON,
*Respondent,*

*v.*

SARN SAEPHAN,
*Appellant.*

0012-73016; A113023

73 P3d 301

Liza Langford argued the cause and filed the brief for appellant.

Devorah Signer Hill, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Landau, Presiding Judge, and Armstrong and Brewer, Judges.

LANDAU, P. J.

**LANDAU, P. J.**

The trial court committed appellant to the custody of the Department of Human Services (DHS) on the ground that, because of a mental disorder, he was unable to provide for his basic personal needs. ORS 426.005(1)(d)(B); ORS 426.130(1)(b)(C). On appeal, appellant argues that the record is insufficient to support that finding. On *de novo* review, *State v. Hitt*, 179 Or App 563, 565, 41 P3d 434 (2002), we reverse.

The relevant facts are undisputed. Appellant is in his early forties. He is an immigrant from Thailand; English is not his native language. In December 2000, he was detained after voluntarily seeking admission to the Oregon Health Sciences University Hospital in Portland. The physician who examined him at that time believed that appellant was "disorganized," "confused," possibly delirious, and a danger to himself.

Several days after appellant was admitted, he was interviewed by a precommitment investigator, Daniel Coker. Apparently, no interpreter was present. As Coker entered and exited appellant's locked room, appellant attempted to leave, but staff prevented him from doing so. During the interview itself, appellant was "cooperative." According to Coker's written report, when Coker asked appellant why he was in the hospital, he responded, "My wife left. I couldn't get in my car and go on." On being asked to explain further, appellant stated, "In the morning I get up and I don't see the heat in the wire * * * my pants * * * my T-shirt." (Ellipses in original.) Appellant correctly stated that he was in Oregon but, when asked what town and what kind of building he was in, he stated that he was in Salem in a two-bedroom apartment. When asked what he wanted to do, he replied, "Today I got to go home * * * take care of something * * * lots of food and everything." (Ellipses in original.) Coker believed that appellant's responses "made little sense," and he terminated the interview. In his report, Coker noted that appellant had suffered "severe" burns to his hand and foot; he described appellant as "disoriented, disorganized, and confused" and as having "no insight" and "poor" judgment. Coker's diagnostic

impression was that appellant was suffering from possible alcohol withdrawal and a possible psychotic disorder not otherwise specified.

A commitment hearing was held four days later. An interpreter assisted appellant. The trial court first advised appellant of his rights as provided in ORS 426.100, including the right to subpoena witnesses, and asked whether appellant would like a one-week setover in order to find family or friends to testify. Appellant stated that he would like to ask his wife or son to come and testify for him; he stated, "I don't understand what the discussion will be if I didn't have them." However, he also stated that he did not want to stay in the hospital for another week. The hearing was not set over.

The trial court also advised appellant that it could order him to be committed for 180 days. Appellant stated that he "couldn't be there that long. I'd probably die first" and that he would rather kill himself than be in the hospital. When the trial court advised appellant that mental health professionals would be asking him questions, appellant stated, "I would like to have you ask about the sponsor," that is, about the person who had sponsored his immigration to the United States from Thailand. Appellant stated, "[I]f I could have medicine and stay with him, it would be better."

In the evidentiary portion of the hearing, appellant was first examined by mental health examiner Michael Stine. Appellant testified that he had gone to the hospital on his own volition because "something was wrong, I couldn't get ahold of myself," and "I didn't know what was going on." He denied that he had been drinking on the day he went to the hospital, stated that he hadn't drunk alcohol for the past two or three weeks, and offered to take a urine test; he stated, "I'm not brave enough to take alcohol right now." When Stine asked appellant if he would try to kill himself if he were released, appellant said that he would not. Appellant explained, "You, you forget. You, you stop and then you think about this, think about that." He also stated, "I forget things and everything is lost. I forget. I just laugh at things and I just forget things." When asked whether there were times that he felt he was "in danger," such as by "walking in front of traffic or something like that," appellant responded, "I didn't,

I didn't go anywhere. Just, just here. I was at the end of the road. There was no other place to go." He also stated that he did not want to go to the hospital, that he did not feel that he had to be "forced" to go, and that he "would be safe if I could go with my sponsor."

Stine also asked appellant where he had been living before he went to the hospital. Appellant responded, "Over there, and then sometimes, sometimes over in the other place. Move around." He also stated that he had been living in a house that he had rented and that, if released, he would stay with his sponsor. Later, he stated that, if he could not stay with his sponsor, "[m]y wife has a place but it's rather small. * * * I have a lot of cars, but I, if I need to go somewhere, if I had somebody to, my friends could take me wherever I need to go." When asked where he would get food, he stated that he would "look for friends, or if I had some rice here or rice there, I'd go, go eat wherever I could find it."

Appellant was able to tell Stine the date and location of the hearing and denied hearing and seeing things that other people do not hear or see. He also denied having previously received treatment for "mental problems."

A psychologist, Dr. Sue Beattie, also examined appellant at the hearing. Beattie asked appellant whether he was separated from his wife, whether being separated was a "difficult emotional experience," and whether "drinking was a part of the problem" between him and his wife. Appellant answered each question in the affirmative. When asked whether he had spoken to his wife, appellant stated that hospital staff had ordered the police to hide the telephone "500 feet away from me" and that patients could use the phone only "if they're good, well off." When asked, "How did you leave things when you separated from your wife," appellant responded, "It's whatever it was. We didn't have any argument. We just haven't done anything." When asked why he believed that he would be welcome to stay with his sponsor, he replied, "I don't have a place to stay." He stated, "If Welfare would give me enough money to rent, then I, I could go there. I could be there temporarily."

In response to Beattie's statement that he had no money, had not spoken to his sponsor or his wife while he was

in the hospital, and had no place to stay, he stated, "My sponsor would let me." When told by Beattie that she was worried that he would not have a place to stay, appellant repeated, "He'd receive me. He says I could stay there a long time. * * * He told me I could stay there a week or two at a time." He stated that he had last spoken to his sponsor two days previously; although he was unable to give his address, he stated, "if I went to look for him, I would remember, remember how to get there." As to his burn injury, appellant testified that it had occurred three months earlier and that it was healed; when asked what kind of medical treatment he had received for the injury, he replied that he had gone to "Kaiser Sunnyside" hospital. Beattie also asked appellant how long it had been since he had a "regular" income. Appellant answered that he "might be able to get Social Security" and that his sponsor had given him money; he also stated, "Other than that, my, my mind hasn't been good." He stated, "Welfare says my mind isn't good. Today, it's good today." At that point, appellant asked, "Wouldn't it be better if you talked to my sponsor?" When told his sponsor was not present and that it would be "very helpful" to speak with the sponsor, appellant responded, "Where is the phone? I'd like to call him."

Beattie also asked appellant when he had last worked and why he had stopped working; he responded that he had last worked three years earlier and had stopped work "[b]ecause of my drinking." He admitted that drinking had been a problem for him but denied that he needed treatment for his drinking problem; when asked how he "would manage [his] drinking," he stated, "I go to the birthday party and they have me drink, and then it's, it's a problem." When asked to describe his mood, he replied, "I would like to go with my friends, be with my friends"; he also described his mood that day as "good." In response to Beattie's questions about medication, appellant responded, in part, that the medicine "helps" and that "every four hours, every four hours I'm supposed to take it." Beattie observed that appellant's thoughts still seemed "very confused"; appellant replied, "Yeah." When Beattie asked appellant about finding a place to stay or food to eat, he replied that he "could look for public housing or something," that he could stay with friends in an apartment

in a building on Halsey, or that he could stay with a friend who had an extra room.

Appellant's counsel also questioned him at the hearing. Appellant testified that he had no money in his wallet that day; when asked whether he was receiving welfare "right now," he asked what day it was and stated, "on the 1st I can probably get some" and that he had an appointment and was "supposed to get some" on the 23rd of that month. He testified that, if released, he would go "[w]herever I could find a place," either with a friend or with his sponsor. He stated that it had been a long time since he had stayed with his sponsor and that it had been "probably a year ago" that he had stayed with friends. He testified that a friend had once given him $70, after which he "ate and ate there. I ate five days and then I slept with them five days."

In response to the state's questions, appellant testified that it had been about three weeks since he and his wife had separated and that, when he lived with his wife, she had provided "the money." He also testified that his wife had been working and he had cooked his own food; he stated that that was how he had burned his hand and foot and that it had been five days from the time he burned himself to the time his wife took him to the hospital for that burn. When asked where his sponsor lived, he replied, "On 48th." When asked whether he had ever been in alcohol treatment, he replied, "No, I haven't taken any alcohol, I just smoke."

The court also questioned appellant. It first asked him how he would get to his friend's residence if released that day. Appellant responded that his brother would pick him up and recited his brother's telephone number; he also stated that, "If I had a quarter, I could call my sponsor" and told the court his sponsor's name. When asked whether he had any warm clothes, appellant responded:

"You go outside, it's cold outside, so—I can walk. It won't, won't be far, with what I have on. What's this road here? It would be better if you took me over there and then I could, I could go. Wouldn't that be better? Can I go now?"

Appellant volunteered, "If I was at home, I would be eating."

In his written examiner's report prepared after the hearing, Stine observed that appellant "remained calm" throughout the hearing, that he seemed to understand the questions asked, and that his responses seemed "largely appropriate with some possible confusion due to language/culture confusion. * * * Despite this he was able to communicate fairly well." Stine's diagnostic impression was that appellant was suffering from alcohol abuse and withdrawal from alcohol dependence. Stine concluded that there was no evidence that appellant was a danger to himself or others and noted that the incident in which he delayed obtaining treatment for his burn injuries had occurred several months earlier. Stine concluded that appellant's circumstances and condition were not the result of a mental disorder.

In her post-hearing examiner's report, Beattie noted that, at various times during the hearing, appellant was confused, "tearful," "visibly shaking," and "distressed" and that he "seem[ed] to have no sense of time or actual resources which may be available to him." Her diagnostic impression was that appellant had an "acute and ongoing" alcohol "problem," that his thoughts were disorganized and his planning "non-exist[e]nt," that he had no insight into the "extremity" of his circumstances, and that he was "severely" depressed. In the section of her report pertaining to whether appellant was able to provide for his basic needs, Beattie noted that appellant had not spoken with his friends or sponsor regarding whether they could assist him. She opined that appellant was "disorganized beyond that which can be accounted for by cultural/language problems" and that his "confusion/disorganization * * * reaches psychotic proportions." Beattie believed that appellant's alcoholism, the disruption of his family life, and his depression were the cause of his mental confusion and caused him to be unable to provide for his basic needs.

In its oral ruling, the court noted that it was "appropriate for [the court] to rely on its own impressions today as the primary basis for at least part of its decision." The court found that appellant's "responses to questions indicate a high degree of confusion" and that the basis for appellant's confusion appeared to be "alcohol abuse." The court found that appellant's answers to questions, including questions about

"time and place and his present condition" and about the "hospital," were "confused" and "disorganized" and that those characteristics were not due to a "lack of understanding of the questions as far as language barriers are concerned" or "anything other than mental disorder." The court found that appellant was unable to properly feed himself; that appellant's clothing was inadequate for the current weather conditions and that he had no "concern or insight" regarding that issue; and that appellant had no place to stay and no adequate or credible plan for finding a place to stay that night. As pertinent here, the court found by clear and convincing evidence that appellant suffered from a mental disorder and was unable to meet his basic needs pertaining to food and shelter.

■     On appeal, appellant argues that there was insufficient evidence to demonstrate that he suffered from a mental disorder or that he was unable to meet his basic needs. As to the former, he points out that Stine concluded that he did not suffer from a mental disorder. As to the latter, he relies on his testimony that he had an "idea" about where he could stay, that he previously had found shelter with friends or his sponsor, and that he knew the address of an apartment building and his brother's telephone number. He also points to the fact that he eventually sought treatment for his burn injuries and that, more recently, he voluntarily admitted himself to a hospital.

The state responds that it proved each factor by clear and convincing evidence. It notes that the precommitment investigator and both mental health examiners at the hearing believed that appellant suffered from alcohol abuse and that the precommitment investigator and one mental health examiner believed that appellant suffered from a mental disorder. The state also relies on evidence of appellant's own "confused" and "incoherent" demeanor at the hearing. The state argues that, at the hearing, appellant had "no money, food, lodging or appropriate clothing, most likely as a result of his extreme confusion and disorganized thought processes"; that he lacked a coherent or credible plan for providing for his immediate needs, such as housing and food; and that he was not in communication with, or aware of the precise whereabouts of, family or friends who could provide

assistance. On those bases, the state urges that clear and convincing evidence supports a finding that appellant was unable to provide for his basic needs.

■■■■    Basic needs are those things that are necessary to sustain life, such as food, shelter, and life saving medical care. *State v. Nguyen*, 180 Or App 541, 546-47, 43 P3d 1218 (2002). A person is subject to a basic needs commitment if clear and convincing evidence demonstrates that, as a result of the person's mental disorder, there is a likelihood that the person probably would not survive in the near future because the person is unable to provide for basic personal needs and is not receiving care necessary for health and safety. *Id.* "Clear and convincing" evidence is evidence of "extraordinary persuasiveness." *See State v. Webb*, 186 Or App 404, 409, 63 P3d 1258 (2003). The state must demonstrate a causal connection between the person's alleged mental disorder and the person's alleged inability to provide for his or her basic needs. *State v. DeMartino*, 164 Or App 331, 335, 991 P2d 1093 (1999); *State v. Gjerde*, 147 Or App 187, 192, 935 P2d 1224 (1997).

The evidence in this case does not meet the required legal standard. Even assuming that appellant suffered from a mental disorder, and even assuming that his disorder was the cause of his current circumstances, the record lacks evidence of the required extraordinary persuasiveness that appellant's circumstances constituted a real threat to his survival in the near future.

As for food and shelter, at the hearing, appellant identified various persons and entities he planned to ask for assistance in obtaining money, food, or shelter if released, including his sponsor, his wife, his brother, his friends, and public resources such as "Welfare," "social security," and "public housing." Also, appellant was able to give at least shorthand descriptions of where some of those resources were located. *Compare State v. Stephens*, 178 Or App 31, 39, 35 P3d 1061 (2001) (where the allegedly mentally ill person planned to stay with a friend, had worked in the past, recognized the need to get a job, and was probably eligible for public assistance, the state failed to prove that he was unable to

meet his basic needs, despite his delusional thinking resulting from his schizoaffective bipolar disorder); *State v. Strasburger*, 138 Or App 409, 416, 909 P2d 197 (1996) (evidence that the allegedly mentally ill person "recognizes the necessity of some activity on his part to provide for his survival," such as finding gainful employment or "depending on the good will of other people," supported a finding that he was able to provide for his basic needs); *and State v. Baxter*, 138 Or App 94, 99, 906 P2d 849 (1995) (although the allegedly mentally ill person's "lack of certain shelter is not a good plan," homelessness by itself is not sufficient grounds for commitment), *with State v. Bolander*, 178 Or App 514, 518-19, 37 P3d 216 (2001) (evidence that the allegedly mentally ill person had no insight into her illnesses or her basic needs and that she had no plan for obtaining shelter after being evicted from her housing supported a finding that the person was unable to meet her basic needs). Nor does the record demonstrate that appellant previously had suffered any life-threatening consequences, such as severe malnutrition or hypothermia, from his arguably haphazard arrangements pertaining to his basic needs. *See DeMartino*, 164 Or App at 338 (the record demonstrated that the allegedly mentally ill person was well-nourished and "planned to continue to eat").

As for appellant's medical needs, the record demonstrates that, based on his apparent recognition of his current episode of mental distress, appellant himself sought admission to the hospital. In addition, he evinced some awareness of the benefit of, and requirements for, taking "medicine" for his mental distress and did not evince any reluctance or refusal to take such medication. The record also shows that appellant previously, albeit belatedly, had obtained medical treatment for burn injuries. Although there was evidence at the hearing, including admissions by appellant himself, that he abused alcohol, there was no testimony that appellant's drinking was itself a life-threatening condition. *Compare State v. Turel*, 182 Or App 235, 240, 48 P3d 175 (2002) (state failed to produce clear and convincing evidence that the allegedly mentally ill person's psoriasis, even if untreated, threatened his survival), *with State v. Jacobson*, 142 Or App 371, 376-77, 922 P2d 670 (1996) (where the allegedly mentally ill person's alcohol abuse had caused at least one seizure, liver

dysfunction, and an increased risk of hip fracture, and where evidence at the hearing demonstrated that the person lacked the ability to stop drinking through voluntary treatment, commitment was necessary for the person's survival). Moreover, appellant testified that he currently did not intend to use alcohol. *See Baxter*, 138 Or App at 96, 98 (the state failed to prove that the possibility that the allegedly mentally ill person might return to his previous behavior, including the use of drugs and alcohol, was sufficiently strong so as to constitute a threat to the person's survival). Nor is appellant's mental "confusion" enough, without more, to justify involuntary commitment. *See Nguyen*, 180 Or App at 547 (although the allegedly mentally ill person suffered from delusions when not taking his medication, the record lacked evidence that that condition prevented him from meeting his basic needs); *State v. Garibbo*, 77 Or App 321, 323, 713 P2d 671 (1986) (evidence that the allegedly mentally ill person was too "disorganized" to meet his basic needs was not enough).

In sum, even assuming that appellant's mental confusion and his history of alcohol abuse constituted mental disorders that were the cause of his circumstances and condition at the time of the hearing, those circumstances constituted no more than speculative threats to his future survival. The trial court erred in determining that appellant was unable to provide for his basic needs.

Reversed.