Submitted on record and briefs September 2, reversed December 7, 1994

In the Matter of Andrew Johnson,
Alleged to be a Mentally Ill Person.

## STATE OF OREGON,
*Respondent,*

*v.*

## ANDREW JOHNSON,
*Appellant.*

(9402-95352; CA A83238)

886 P2d 42

Theresa M. Kohlhoff filed the brief for appellant.

Theodore R. Kulongoski, Attorney General, and Virginia L. Linder, Solicitor General, and Richard D. Wasserman, Assistant Attorney General, filed the brief for respondent.

Before Rossman, Presiding Judge, and Leeson and Haselton, Judges.

LEESON, J.

Rossman, P. J., dissenting.

## LEESON, J.

Appellant seeks reversal of an order committing him to the Mental Health Division. ORS 426.307(6). He contends that the state failed to prove by clear and convincing evidence that he is a mentally ill person because he is "dangerous to self." ORS 426.005(1)(d). On *de novo* review, *State v. Weyeneth*, 115 Or App 555, 557, 838 P2d 1113 (1992), we reverse.

Appellant is 20 years old. He dropped out of high school at age 18, because he "didn't fit in, didn't feel right." He has worked at a pizza restaurant and at a window manufacturing company. He lived at home until September, 1993. Following a dispute with his step-father, he lived in his car or with friends. In December, 1993, appellant consulted his family physician, because he was feeling depressed after a sinus infection, a severe bout of the flu and his decision to stop seeing friends who were involved with illegal drugs. He was given a prescription for Imipramine, an anti-depressant, but he did not begin to take it until he had stopped using an inhaler prescribed for his sinus infection and an antibiotic prescribed for the flu. Soon after he began taking Imipramine, he experienced a range of physical and psychological symptoms. His mother took him to the hospital when she observed that he had a rash, his eyes would flutter and roll back into his head, his eyes were bloodshot, and he had trouble breathing. He was treated with Benadryl, but his psychological symptoms worsened. He became delusional, disoriented and heard voices. He also became incontinent. His mother took him back to the hospital, where he was admitted on February 7, 1994, for "acute onset of psychosis." Commitment proceedings were initiated, and a commitment hearing was held on February 22, 1994.

At the hearing, appellant was examined by mental health professionals Mike and Sheets. Both expressed the opinion that appellant is unable to provide for his basic needs. Neither found that he is a danger to others. However, Mike placed a check on the line of the examiner's report form indicating that, in his opinion, appellant is "dangerous to self." Sheets left that line blank.

At the conclusion of the hearing, the trial court stated:

> "I am going to order his commitment. I understand his mother's concern, but I think both the examiners and the Court is [*sic*] convinced there's some underlying problem that needs to be examined, and certainly if his problem is of a temporary nature, they will release him and put him on an outpatient basis. I'm going to put it on grounds of danger to self."

The court's written order contains a check mark on the form indicating that appellant is dangerous to himself.

On *de novo* review, we examine the record to determine whether the state has established by clear and convincing evidence that appellant is a danger to himself. In order to be "clear and convincing," evidence must be of "extraordinary persuasiveness." *State v. Siebold*, 100 Or App 365, 366, 786 P2d 219 (1990). We consider appellant's mental state at the time of the hearing and must be persuaded that it is "highly probable" that appellant is a danger to himself. *State v. Woolridge*, 101 Or App 390, 394, *mod* 102 Or App 559, 794 P2d 1258 (1990). In reviewing the record, we require examiners to fully explain the facts and observations that led them to a particular conclusion. *State v. Alexander*, 26 Or App 943, 947, 554 P2d 524 (1976); *see also State v. Fletcher*, 60 Or App 623, 627, 654 P2d 1121 (1982).

At the hearing, appellant testified that he felt "groggy" and "tired" because of the medications he was taking.[1] Nonetheless, he responded coherently to most questions and expressed strong opinions about what had happened to him since he started taking Imipramine. During her examination, Sheets asked appellant about voices that he had reportedly heard. Appellant responded that the voices were really thoughts telling him not to relax. Sheets inquired:

Q. "[I]n our report it appears that you had heard some voice tell you to kill yourself. Have you heard any voice telling you to do that recently?"

---

[1] Examiner Mike observed that appellant was "heavily sedated." Appellant's counsel stated that appellant had been given a number of tranquilizers before the hearing. He stated that appellant no longer was taking Imipramine but that "we're waiting for that to percolate out of his system."

Q.     A.   "No."

Q.   "Do you have any thoughts about wanting to harm yourself?"

A.   "No, I don't want to hurt myself. I want to live; I don't want to die. I just want to live a regular life and be a happy human being like most of you in here seem to be."

Appellant also expressed a strong desire to return to his parents' home.[2] He expressed a preference not to take any more medications but said that he would if his physician told him to. He also testified that he would be willing to participate in family therapy with his parents.

Appellant's mother testified that appellant's mental condition is "all new to me," that it started when appellant began taking Imipramine, and that he had not acted normally since being hospitalized and given drugs such as Haldol, Thorazine and Valium. In response to a question about whether appellant had heard voices, she said:

"When he was first in the hospital with all the noise in the hallway, some of the times he would think he was hearing voices and then it would be people in the hallway, so he couldn't distinguish between exactly what was going on around him and what was happening with him."

She testified that, although appellant suffered from hallucinations or delusions when he was first admitted to the hospital, he had not experienced either in the week before the hearing.

Only examiner Mike found that appellant is a danger to himself, and he qualified that finding with the phrase, "harms [sic] way." He did not explain what he meant by that phrase or why he qualified his finding in that manner.[3]

---

[2] Examiner Sheets questioned appellant repeatedly about whether he would follow his parents' instructions if he was released to their custody. On one occasion, he responded that he would cooperate with them unless "it was against my code of honor." He followed up that statement by saying, "I'm a very reasonable guy, so I would probably cooperate, whatever it was."

[3] Mike added the following written comments:

"Twenty year old, single, white male who appears heavily sedated, facial grimacing. Thoughts confused and disorganized. Gives no reason for hospitalization. Claims reason for hospitalization was [illegible] he was making bad decisions. Admits to symptoms reported in notification of mental illness. Has history of auditory hallucinations. Claims he went to hospital because he hadn't

Examiner Sheets left blank the lines on which she was to indicate whether appellant is a danger to himself, but she responded to all other parts of the examiner's form.[4]

Having reviewed the record carefully, we conclude that the state produced some evidence that appellant is a danger to himself, but that it did not produce the extraordinarily persuasive evidence required by the clear and convincing standard. The written comments of both examiners suggest concerns about appellant's ability to provide for his basic needs rather than concern that he is a danger to himself. Appellant's mother testified that he began hearing voices only after he took Imipramine. Appellant and his mother both testified that he had not heard any voices recently. Appellant testified that he wants to live and that he does not want to hurt himself. In short, the state failed to prove that, at the time of the hearing, it was highly probable that appellant was a danger to himself.

■    Because we review *de novo*, we may consider alternative grounds for commitment if sufficient evidence was presented to enable us to make a finding. We therefore next consider whether there is clear and convincing evidence to support appellant's commitment to the Mental Health Division on the ground that he is unable to provide for his basic needs.

■■    In order to meet the basic needs standard, the state must prove by clear and convincing evidence that appellant is unable to obtain some commodity or service without which he cannot sustain life. *State v. Bunting*, 112 Or App 143, 826 P2d 1060 (1992). Appellant's basic needs may be met through his

---

been sleeping for three weeks. Insight and judgement [*sic*] impaired. Admits to confusion and difficulty in making decisions. Some history of substance abuse/marginal social associates."

[4] Examiner Sheets provided the following written comments:

"20 yr old white male who was incontinent and having difficulty making decisions after taking imipramine. Pt. states he would cooperate with his parents [*sic*] directions unless he disagreed with them and then he would not cooperate with them. Pt. states he remains confused and was hospitalized after being unhappy at home with his father. Pt. was living in his car for 4 to 5 months because he was upset with his parents. Pt. having trouble with voices within past 2 weeks. I am concerned parents would not be able to be sure he would follow directions due to their previous difficulty with him."

own resources or with the help of family or friends. *State v. Gill*, 120 Or App 543, 547, 853 P2d 304 (1993). Commitment is not justified if family or friends are available to assist. *State v. Herdan*, 129 Or App 24, 27, 882 P2d 605 (1994).

■ At the hearing, appellant's mother repeatedly stated that she wants to have appellant return to her home until he has recovered and that she will ensure that he receives "continual care until we figure out exactly what's going on with him." She testified that her husband is willing to have appellant live with them, that appellant is not difficult for her and her husband to manage[5] and that she and her husband are financially able to support appellant until he is able to return to work. Appellant testified that he wants to return to his parents' home and that he will take medications if ordered to by his physician.

In her report, examiner Sheets stated that she was "concerned [appellant's] parents would not be able to be sure he would follow directions due to their previous difficulty with him." However, appellant testified that he wanted to go back to his parents' home. When questioned about previous disagreements with his step-father, appellant responded that he left home and lived in his car "just to be an idiot, just lack of communication." He testified that, if released to his parents, he would be reasonable and would be willing to participate in family therapy.

In the light of testimony that appellant's mother wants him to return home, that appellant wants to return home, that his mother and step-father will provide for his needs, and that his mother will seek medical treatment for

---

[5] Examiner Sheets questioned appellant's mother in detail about her ability to manage appellant because of his statement to Sheets that he would follow his parents' instructions unless they violated his "code of honor." *See supra* n 2. Appellant's mother responded:

"I don't think I'll have a problem. I don't think I'll have a problem with him not — the main thing he's going to have to do is get some help and get some medications figured out if we have him on the correct medication, you know. I'm certainly not going to make my own judgments in that regard.

"I don't think I'll have a problem with him. He's not going to have his car and car keys and be able to drive. We live in the country on 15 acres, so we're pretty isolated that way."

him, we cannot say that there is clear and convincing evidence that appellant's basic needs will not be met.[6]

Reversed.

**ROSSMAN, P. J.,** dissenting.

I have full respect for my colleagues' ability to conduct a thorough and thoughtful *de novo* review of the record before us. Nevertheless, I must dissent, because I believe strongly that, where questions of credibility are concerned, this court should defer to the trial judge, who has had the benefit of evaluating the witnesses first hand. These kinds of proceedings—while involving very important constitutional and statutory safeguards—are often emotionally charged and generally end up presenting human, not legal, questions, where the evaluation of the witness is the most critical key in resolving the case. In that light—absent a clear factual showing pointing only to one logical conclusion—I am extremely hesitant to reverse a trial judge's commitment decision on the basis of our assessment of a cold record.

Here, the majority's sole reason for reversing the trial court is its belief and acceptance of the testimony of appellant and his mother. I believe that the trial judge was in a far more advantageous position to evaluate the credibility of those witnesses than are we from our remote vantage point. Although we should always be vigilant in our response to legal error, we should not feel at liberty to reverse a trial judge when the only claimed error is that the judge believed or disbelieved a witness. Our judicial system would truly be amiss if that became a guiding standard.[1]

---

[6] The dissent contends that "absent a clear factual showing pointing only to one logical conclusion," appellate courts should defer to a trial court's commitment decision. 131 Or App at 568. While that approach would simplify our task of review, it pays only lip service to the fact that persons who are involuntarily committed are deprived of their constitutional right to liberty, that our standard of review is *de novo* (not abuse of discretion), and that the standard of proof is clear and convincing evidence.

In this case, although the dissent places great emphasis on the trial court's ability to make credibility findings, 131 Or App at 568, the trial court did not make such findings. The medical examiners did not testify, which could have revealed their reasoning and allowed the judge to evaluate the checks they made on the examiners' forms.

[1] The majority is certainly correct in emphasizing that our objective is to review *de novo*; I do not question that. I disagree only with its implicit holding that there should be no deference to the trial judge's evaluation of credibility.

There was clear evidence before the trial court that appellant had contemplated killing himself, although he denied that at the commitment hearing. The trial judge is the only judge who has sat with appellant, eyeball to eyeball; he was in the superior position to ascertain what the fact really was. There was also evidence that appellant's mother and her husband might not be able to manage appellant sufficiently to even *dispense* the care that they are willing to provide to him. Again, the trial judge is in the best position to assess the likely success of mother's plan to provide care.

Given the potential consequences of *not* committing a mentally ill person who is, in fact, a danger to himself or whose basic needs will not be met, I cannot in good conscience go down the path taken by the majority.