Argued and submitted December 4, 2001, reversed February 20, 2002

In the Matter of Charles Hitt,
Alleged to be a Mentally Ill Person.

STATE OF OREGON,
*Respondent,*

*v.*

CHARLES HITT,
*Appellant.*

00M0010; A111976

41 P3d 434

James A. Palmer argued the cause and filed the brief for appellant.

David F. Coursen, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before Haselton, Presiding Judge, and Linder and Wollheim, Judges.

HASELTON, P. J.

**HASELTON, P. J.**

Appellant challenges an order continuing his civil commitment pursuant to ORS 426.307. We conclude on *de novo* review, *State v. O'Neill*, 274 Or 59, 61, 545 P2d 97 (1976), that the state failed to adduce "clear and convincing" evidence that appellant was dangerous to others or incapable of providing for his basic needs. ORS 426.005(1)(d)(A), (B). Accordingly, we reverse.[1]

Before describing the material facts, we must address—and clarify—the scope of the record before us. This is an appeal from an order of further commitment for mental illness rendered in Josephine County Circuit Court on October 5, 2000. Defendant was initially committed by the Marion County Circuit Court on May 14, 1998, and his commitment was successively continued in October 1998, May 1999, October 1999, and April 2000.[2]

At the October 5, 2000, hearing, three witnesses testified, including appellant, but no exhibits were offered. The trial court *file* at that time included not only the pleadings pertaining to the October 2000 further commitment matter, but also the pleadings pertaining to appellant's initial May 1998 commitment and the four subsequent continuations of commitment. The trial court file also included the precommitment investigator's report, dated May 13, 1998, as well as two examiners' reports dated May 14, 1998.[3] The *record* of

---

[1] At oral argument, we raised the question of whether this case might have been rendered moot because the period of further commitment had expired. We conclude, for the reasons stated in *State v. Linde*, 179 Or App 553, 41 P3d 440 (2002), that this case is not moot.

[2] The original order of commitment was entered in Marion County Circuit Court case number 98C14172. The orders of further commitment in October 1998, May 1999, and October 1999 were also entered in the same Marion County case. In January 2000, appellant was transferred from a facility in Marion County to the Hugo Hills facility in Josephine County, and the Marion County Circuit Court entered an order transferring jurisdiction of the case to the Josephine County Circuit Court, where it was redesignated as case number 00M0010. The Josephine County court entered the April 2000 and October 2000 orders of further commitment.

[3] There is no indication that the precommitment investigator's report was ever admitted as evidence in the original commitment proceeding, much less in this proceeding. *See* ORS 426.095(4)(d) (relating to admission of investigator's report). Nor

the October 2000 further commitment proceeding does not, however, include any transcript of the original commitment proceeding or of the four prior further commitment proceedings; nor does the record disclose, much less include, the exhibits, if any, that were received at those proceedings.

In sum, the only evidence in this record is: (1) the testimony given at the October 5, 2000, hearing; (2) the report of the psychologist who certified the need for further commitment, ORS 426.307(6); and (3) by way of judicial notice, OEC 202(1), the content of the original order of commitment, which determined—without findings or explanation—that appellant was dangerous to others and could not provide for his basic needs, and the subsequent orders that continued appellant's commitment based on similarly unamplified determinations.

■■   With the scope of the record so described,[4] we return to recounting the material facts. At the time of the hearing, appellant was 48 years old and had been diagnosed as having chronic paranoid schizophrenia, as well as hepatitis C. Appellant also had a history of substance abuse. Appellant was originally involuntarily committed in Marion County in May 1998 on the grounds that he was dangerous to others and could not provide for his basic needs. As noted, appellant's commitment was subsequently continued five times between May 1998 and October 2000. In January 2000,

---

were the examiners' reports, which were included in the record at the original commitment proceeding, *see* ORS 426.120(1) (relating to admission of examiners' reports), admitted as exhibits in this proceeding. Accordingly, although those materials were placed in the trial court *file*, which encompassed all filings in Marion County Circuit Court case number 98C14172 and Josephine County Circuit Court case number 00M0010, they are not part of the *record* of the October 5, 2000, further commitment proceeding. The state does not assert that any portion of those materials is judicially noticeable as substantive evidence of the need for further commitment.

[4] Our protracted description of the scope of the record may seem pedantic, or even tiresome. But there is a point to the exercise: Initial commitment and further commitment are distinct proceedings, *compare, e.g.*, ORS 426.070 to ORS 426.300 *with* ORS 426.301 to ORS 426.307, and the record of the former is not automatically incorporated into the record of the latter. Nor are materials placed in the trial court *file* necessarily and automatically deemed incorporated into the evidentiary *record* of the commitment or further commitment proceeding. This case highlights that confusion and the difficulties that may result.

appellant was transferred to the Hugo Hills treatment facility in Josephine County "due to the potential destructive consequences of his delusional system." On September 18, 2000, Dr. Andrew Axer, director of Hugo Hills, certified the need for appellant's further commitment pursuant to ORS 426.301, and appellant protested that certification and requested a hearing. ORS 426.303.

In his report submitted in support of continued commitment, Axer noted that appellant's initial commitment occurred after he had "violated a restraining order and resisted arrest." Axer further noted that "The U.S. Secret Service has placed [appellant] under their highest surveillance class due to his alleged history of making threats on President Bush's life."[5] Axer then listed three "barriers to discharg[ing]" appellant:

"1. [Appellant] suffers from symptoms of schizophrenia, paranoid type. He also has a history of amphetamine and cannabis use. Symptoms of his mental illness include general suspiciousness, paranoid beliefs regarding government officials, considerable thought disorganization, and frequent anxiety. He is very guarded in self-expression and has no insight into his own mental illness.

"2. [Appellant] needs on-going nursing and medical supervision. Following the liver biopsy procedure on 8-29-00 he fell in the bathroom and suffered seizure-like symptoms.

"3. During the interview with the prospective community providers last month, [appellant] re-stated his desire to carry a rifle and ride a motorcycle (without a valid driver's license) after his discharge from Hugo Hills."

At the October 5 hearing, Axer and Dr. Garwood, the treating psychiatrist at Hugo Hills, both testified. Axer began his testimony with the following observation: "I'd like to say that [appellant] has been a model citizen of Hugo Hills for the last six months." Axer elaborated: "[T]here were no incidents of any kind of dangerous or obnoxious behavior that we could

---

[5] Axer's report was dated October 5, 2000. Consequently, the "President Bush" to whom he was referring was, necessarily, former President George Herbert Walker Bush. The record before us does not disclose when the "threats" occurred or the substance of those "threats."

see. Maybe except for bumming cigarettes from other people. But that's human."

Axer then expressed his concerns that appellant would, upon discharge, mismanage his finances because he spent "all his money" on a motorcycle, "without leaving himself anything." Axer also expressed reservations that, if appellant moved back to Riddle, where his family lives, he would become involved with "a criminal element" in that area. Finally, Axer believed that appellant needed to become better educated about "symptom management" and avoiding substance abuse. On cross-examination, Axer acknowledged that appellant had been taking classes addressing symptom management and substance abuse but

> "[W]hat I'm saying is that we would like to see that before [appellant is discharged that he has [a] fully developed relapse prevention plan that would include, endorsed by [appellant], at least of his warning signs of relapse, and at least the medication he's taking, understanding by [appellant how this medication works for him and why it's not a good idea to replace them with street drugs."

Garwood testified that appellant's chronic paranoid schizophrenia caused "some impairment of intellectual functioning * * * not a great impairment[,] but there is some." Garwood corroborated that appellant had not, for the last six months, presented "any significant behavior problems on the unit[.]" He further acknowledged that, although the Secret Service was monitoring appellant based on a "history of being obsessed with certain political figures[,]" and a "fascination" with "weaponry, especially firearms," appellant had not "voiced any such threats to political figures or anyone else at least in the last six months[.]" Finally, Garwood expressed his belief that, if appellant were not closely monitored, "he would probably become noncompliant with his medications."

On cross-examination, Garwood acknowledged that, as nearly as he knew, the source of appellant's "fascination with weapons" was that appellant "comes from a family of hunters" and had grown up in a rural area doing a lot of hunting. Nevertheless, Garwood pointed to appellant's desire to have a firearm, which would violate state law, as illustrating "his lack of insight and his continued impaired judgment."

Garwood pointed to appellant's desire "to get his driver's license back and drive around on a powerful motorcycle" as another example of such impaired judgment. Ultimately, on recross-examination, Garwood testified as follows:

> "*I don't think that he needs confinement to Hugo Hills based on his security risk and I apologize if I misled the Court to the contrary.* I was pointing out, I was trying to paint a complete picture of his background and the total factors considered. *I personally don't feel that he's a high risk to a political figure for violence.* The Secret Service has a different standard and a different threshold that they abide by. No one can make predictions with absolute certainty about violence. I think it's fairly widely known now, even psychiatrists, and the only, or best predictor is still past violence and past violent behavior. *But I do feel that he is of some risk and I do feel that he does require some monitoring. I don't feel that for that specific issue that he needs Hugo Hills level of care.*" (Emphasis added.)

Finally, appellant testified. He stated that, upon discharge, he would rent an apartment in the Riddle area, using Social Security benefits, perhaps supplemented by income from working at a local mill.[6] Appellant also expressed a desire to continue his education at Umpqua Community College, taking welding classes. Appellant denied that he was a security risk, without describing the particulars of the alleged "threats." When asked about his interest in firearms, appellant explained:

> "Well, I started out when I was 14 years old in the National Rifle Association club, a junior rifle club, shooting targets. It was when I lived in Orange, in southern California. And the range was in short distance from Anaheim Stadium. And I used to go to rifle matches. And there is no place to hunt in southern California, so when we came to Oregon again I began to resume hunting."

Finally, appellant confirmed that he had hepatitis C and that he had blacked out on one occasion several weeks before the hearing, following a liver biopsy. However, there had been no other fainting spells.

---

[6] Appellant also testified that in the past he had run his own upholstery shop for about six years.

The court ultimately continued appellant's commitment for a period of up to 180 days stating:

> "[F]rom hearing from [appellant] it sounds like he also is thoroughly convinced that he really doesn't need to be in any mental health facility and I'm hoping, I mean based on what he is saying because he certainly is talking sense to me and I understand, I'm tracking with him completely, very cogent, well spoken, easily a very, the highest functioning resident here at Hugo Hills that I think I've ever heard, I have hopes for him that he will be able to join the general population and get his driver's license back and enjoy what life has to offer.

> "All that being said, I am still convinced that he does suffer from a mental disorder and he does need further treatment. The issue is, how quickly can we proceed to get [appellant] back into the general population and what steps may be involved in getting him there. Those are not my call. I would encourage the folks here at Hugo Hills to work, I think they have been working to try and find a more appropriate placement for [appellant].

> "[Appellant], I don't, I don't care what the Secret Service thinks. That is not what controls my view of you at all. I think that, that you are progressing and that you don't need to be in this type, or high a degree of security. I do think you have some issues you need to work through and as soon as we get to that point I wish you well."

On appeal, appellant argues that there is insufficient evidence to find that he is dangerous to himself or others and/or unable to provide for his basic needs. ORS 426.005(1)(d)(A), (B).[7] We agree.

■ We turn first to the "basic needs" ground for continuing appellant's commitment. To justify further commitment on that basis, the state must prove that "there is a likelihood that the person probably would not survive in the near future because the person is unable to provide for basic personal

---

[7] ORS 426.005(1)(d) provides, in part:

" 'Mentally ill person' means a person who, because of a mental disorder, is one or more of the following:

"(A) Dangerous to self or others.

"(B) Unable to provide for basic personal needs and is not receiving such care as is necessary for health or safety."

needs and is not receiving care necessary for health or safety." *State v. Bunting*, 112 Or App 143, 146, 826 P2d 1060 (1992). The state must make that showing by "clear and convincing evidence," that is, evidence of "extraordinary persuasiveness." *State v. Gjerde*, 147 Or App 187, 191, 935 P2d 1224 (1997). *See also State v. Jayne*, 174 Or App 74, 77-78, 23 P3d 990, *rev den* 332 Or 316 (2001) (describing "clear and convincing evidence" as evidence establishing that the "truth of the facts asserted is highly probable").

■    The state did not make that showing here. There is no suggestion in the record that appellant would not be able to function independently upon release, much less that he "probably would not survive in the near future." *Bunting*, 112 Or App at 146. Appellant has sources of income and demonstrated job skills and articulated a clear and rational plan for proceeding upon his release. At most, the record discloses a speculative possibility that appellant might not maintain his prescribed medications and might not fully appreciate the risks of substance abuse. However, those possibilities alone do not, and cannot, justify further commitment. *See, e.g., State v. Blanding*, 174 Or App 238, 242, 23 P3d 436 (2001) ("The state has failed to produce evidence that appellant's refusal to take her medication will threaten her survival in the future."); *State v. Baxter*, 138 Or App 94, 98, 906 P2d 849 (1995) ("by itself, failing to take medication is not sufficient if it causes only a speculative threat"; also noting that state had failed to prove that the potential that the committed person might return to a previous pattern of using drugs and alcohol "was so severe as to constitute a threat to his survival"). *See also Linde*, 179 Or App at 559-60.

■    The evidence pertaining to appellant's alleged dangerousness to others is also insufficient. That evidence consists of three components: (1) Appellant was initially committed in May 1998, after an incident in which he violated a restraining order and resisted arrest; (2) at some point in the past, appellant made unspecified "threats" against former President Bush, which resulted in him being placed in the Secret Service's "highest surveillance class"; and (3) appellant has a lifelong fascination with weapons, including firearms.

As noted, the record does not disclose any details with respect to the first incident, which triggered appellant's initial commitment. In particular, we cannot discern from this record whether that incident involved threats of violence or any use of a weapon. Moreover, more than two and one-half years had passed between that incident and the October 2000 further commitment hearing. At the time of the hearing, appellant had been a "model citizen" at Hugo Hills for at least six months and had not threatened or assaulted anyone in that time.

The second matter, the alleged threats against former President Bush, is, frankly, of much greater concern. Any threat against a President or former President is, obviously, an extremely serious matter, as the history of the last 40 years has so tragically demonstrated. Nevertheless, the record does not disclose when the supposed threats were made,[8] the substance of the threats, or whether appellant ever acted, or attempted to act, on those threats. Nor does the record show that appellant was ever criminally convicted of any threats or conduct directed against former President Bush. Conversely, the record does establish that appellant was *not* initially committed based on any threats against political figures. The record also demonstrates that appellant had not expressed threats against any political figure—or against anyone else—for at least six months preceding the October 2000 hearing. In fact, the record before us does not disclose when appellant last threatened *anyone*. Finally, appellant's treating psychiatrist, Garwood, rendered the opinion that appellant did not require confinement at Hugo Hills "based on his security risk."

■ Given the totality of that evidence, we cannot conclude, on this record, that appellant's threats against former President Bush warranted further commitment on the ground that he is dangerous to others. The test for continued

---

[8] At least arguably, given the record's reference to "President Bush," the threat could have been made any time after George H. W. Bush's inauguration in January 1989, which could mean that up to 11-1/2 years had elapsed between the alleged threats and the October 2000 further commitment proceeding. In all events, the record strongly suggests that the threats were made before appellant's initial commitment and, thus, that at least two and one-half years had elapsed between the threats and the further commitment proceeding.

commitment is not whether appellant *was* dangerous to others but, instead, whether appellant *remains* a danger to others. *See, e.g., State v. King*, 177 Or App 373, 377, 34 P3d 739 (2001) ("Whether a person falls within the definition of the statute is determined by his condition at the time of the hearing as understood in the context of his history."); *State v. Woolridge*, 101 Or App 390, 394, 790 P2d 1192 (1990) ("Conclusions based on conjecture as to whether appellant poses a danger to others are insufficient * * *. Whether a person poses such dangerousness * * * is properly determined by his condition at the time of the hearing."); *State v. Jepson*, 48 Or App 411, 416, 617 P2d 284 (1980) ("Past verbal acts, while probative, must be supported by evidence that they clearly form a foundation for predicting future dangerousness.").

We reiterate: On this record, we do not know the substance of the alleged threats or when they were made. We do know that Axer characterized appellant as a "model citizen" who had not engaged in violent or threatening behavior for at least six months and that Garwood rendered the opinion that concerns about appellant as a "security risk" did not warrant his further commitment at Hugo Hills. In sum, the record does not disclose evidence "clearly form[ing] a foundation for predicting further dangerousness." *Jepson*, 48 Or App at 416.

In so concluding, we do not in any way minimize the seriousness of any threat against a President. Indeed, because of that risk, however abstract, it may be tempting to "err on the side of caution" and to continue a person's commitment because "you can never be sure." In this case, however, that reasoning would, effectively, transform appellant's commitment into a permanent commitment because no judge can ever be *sure* that the committed person will *not* engage in further violence. That reasoning, however, effectively shifts the burden of proof from the state to appellant. Oregon's civil commitment statutes do not permit that result.

Finally, the state points to appellant's "fascination" with firearms as evincing dangerousness to others. However, nothing in the record discloses that appellant has ever used or, indeed, threatened to use, weapons violently. To the contrary, the only evidence is that appellant's "fascination"

arises from his participation in rifle competitions as a youngster and his lifelong interest in hunting.

In sum, whether viewed individually or cumulatively, the state's evidence of appellant's alleged dangerousness to others was inadequate to justify his further commitment. Accordingly, the trial court erred in continuing appellant's commitment.

Reversed.