Argued and submitted December 4, 2001, reversed February 20, 2002

In the Matter of Elton A. Linde,
Alleged to be a Mentally Ill Person.

STATE OF OREGON,
*Respondent,*

*v.*

ELTON A. LINDE,
*Appellant.*

00M0037; A112195

41 P3d 440

James A. Palmer argued the cause and filed the brief for appellant.

Kathryn T. Garrett, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before Haselton, Presiding Judge, and Linder and Wollheim, Judges.

HASELTON, P. J.

## HASELTON, P. J.

Appellant seeks reversal of an order continuing his civil commitment pursuant to ORS 426.307. He asserts that the state failed to prove, by clear and convincing evidence, that, because of a mental disorder, he continued to be either a danger to himself or unable to provide for his basic personal needs. *See* ORS 426.307(6). On *de novo* review, *State v. O'Neill*, 274 Or 59, 61, 545 P2d 97 (1976), we conclude that the state failed to prove that appellant's commitment must be continued. Accordingly, we reverse.

■ Before addressing the merits, we first consider the question of possible mootness, which we raised *sua sponte* during oral argument in this case. More than 180 days has passed since the October 26, 2000, order continuing appellant's commitment, which is the object of this appeal. Consequently, because appellant is no longer confined by reason of the challenged order,[1] the case is moot unless other consequences of that order forestall mootness.

In *State v. Van Tassel*, 5 Or App 376, 385, 484 P2d 1117 (1971), we held that the stigma resulting from an initial order of commitment was a sufficiently material consequence to preclude mootness notwithstanding the expiration of the period of commitment:

"[T]he fact that defendant had been involuntarily committed as a mentally ill person would not be a secret, irrespective of other material contained in the court record.

"Whether a society should view mental illness as carrying with it more stigma than any other form of illness, it, in fact, does. A legal commitment for mental illness may have deleterious collateral effects in addition to stigma."[2]

---

[1] In response to our request, counsel submitted additional information concerning appellant's current status. On April 20, 2001, appellant's commitment was continued for an additional 180 days. As of October 21, 2001, appellant was no longer committed.

[2] In *Van Tassel*, we suggested that an additional collateral consequence could arise because "[d]efendant, in the case at bar, is subject to a potential financial liability for his commitment[,]" *viz.*, that he could be required "to pay for the care and maintenance he received while in the custody of the Oregon State Hospital"—and that appellate reversal "voiding the commitment proceedings would remove the basis for imposing such a liability on defendant and would afford him some real

The question here is whether any additional stigma arising from prolonging the duration of appellant's commitment in this case was sufficiently material to render this case justiciable notwithstanding that appellant is no longer confined pursuant to the challenged order.

■        We conclude that this case is not moot. Although continuation of commitment obviously differs from an initial commitment in certain respects, the stigma that arises from commitment is a function not only of the fact of commitment but, also, of its duration. Bluntly, the longer someone is committed for a mental illness—six months versus one year; one year versus three years—the greater the attendant stigma. Like Chief Judge Schwab in *Van Tassel*, we decry the ignorance that generates such attitudes among many in our society. But they are undeniable. Consequently, this case is not moot.

We return to the material facts. Appellant was initially involuntarily committed by the Jackson County Circuit Court in May 2000. The reasons for that commitment are not disclosed in the record of the October 26, 2000, further commitment proceeding, which underlies this appeal.[3] On October 11, 2000, appellant was served with a certificate for continuation of commitment pursuant to ORS 426.301. That certificate was signed by Dr. Andrew Axer, Director of the Hugo Hills treatment facility in Josephine County.[4] On the same day, appellant protested continuation of his commitment and requested a hearing. *See* ORS 426.301(5); ORS 426.303.

At the time of the further commitment hearing, appellant was 22 years old, had a history of substance abuse, and was diagnosed as having chronic paranoid schizophrenia. In his report, which accompanied the certificate and was

---

relief." 5 Or App at 380. That reasoning does not survive *Brumnett v. PSRB*, 315 Or 402, 848 P2d 1194 (1993). Nevertheless, it is clear from *Van Tassel* that the potential exposure to liability for the costs of the committed person's care was merely an alternative consequence identified by the court—and that continuing stigma, by itself, forestalled mootness.

[3] *See State v. Hitt*, 179 Or App 563, 41 P3d 434 (2002) (describing content of record in appeal of order from further commitment).

[4] In July 2000, appellant had been transferred from the Rogue Valley Medical

submitted to the trial court, Axer described two "barriers to discharg[ing]" appellant:

"1. [Appellant's] symptoms of schizophrenia include severe disorganization of thought process and persistent auditory hallucinations. He is irritable especially when his voices are louder and more disturbing. [Appellant] doesn't acknowledge having psychotic symptoms. He believes that he was hospitalized just because he didn't have any other place to stay. He doesn't understand the need for his further pharmacological treatment.

"2. [Appellant] has a history of serious substance abuse problems. He had [a] few episodes of secretly inhaling glue at Hugo Hills until the staff realized what was going on. [Appellant] is unaware of the risks associated with street drugs. He also states a desire to drink beer when released from Hugo Hills[.]"

At the hearing, Axer and Dr. Wes Garwood, the treating psychiatrist at Hugo Hills, testified consistently with the concerns described in Axer's report. More particularly, Axer and Garwood advanced three related reasons why appellant's commitment should be continued. First, they reiterated their concerns about appellant's interest in drinking beer and using illegal drugs—they specifically pointed to staff reports of a "few" glue-sniffing incidents—and expressed their belief that appellant did not appreciate the risks associated with such abuse. Axer testified:

"He indicated to me that he would not take street drugs if he is discharged, but he would drink beer, and that he doesn't really see the—any reason why medication and alcohol could be a poisonous mixture."

Second, Axer and Garwood testified that appellant did not view himself as being mentally ill and that he had been "grudgingly" compliant in taking his medication. Third, and most globally, both doctors were concerned that, outside the structured environment of the hospital, appellant would be generally unable to appreciate and deal with the risks he would encounter because of mental illness. In that regard, Garwood testified that, although appellant hoped to be able to live on his parents' property upon discharge, appellant's parents had been "very clear" that "that is not a viable

option." Appellant testified that he receives $512 a month in Social Security benefits and also receives income from a trust, which pays certain living expenses. Upon discharge, and with his father's assistance, appellant would use those funds to rent an apartment and complete his college education. Appellant acknowledged that he had sniffed glue while at Hugo Hills, but that had happened only once, and he testified that he would "never do it again" because "it smelled bad" and he "didn't like" it. Appellant testified that the staff at Hugo Hills subsequently had spoken with him about the dangers of glue sniffing[5] and that he now knew that it could permanently injure him. Finally, appellant stated that, although he still did not feel he needed to take his medication, he would take them "[i]f it was a condition of my release."

At the conclusion of the hearing, the trial court recommitted appellant for a period up to 180 days and stated:

"[I]t's very clear that you still need the assistance of the folks here at Hugo Hills. You do have a mental illness. You do need the medications. You need to understand at some point what they're for and how they assist you or what modification they make in your daily routine."

On appeal, appellant argues that there is insufficient evidence to find that he is dangerous to himself and/or unable to provide for his basic needs.[6] ORS 426.005(1)(d)(A), (B).[7] We agree.

---

[5] Axer testified that appellant had "acknowledged that that actually happened, which I consider to be a positive fact that he was open and direct with me and had guts to tell me that what happened happened." Axer was concerned that appellant had been unaware of the potential brain damage that could result from glue sniffing.

[6] Appellant also argues, for the first time on appeal, that the trial court erred in giving him an incomplete advice of rights by not notifying him that he had the right to subpoena witnesses who would not appear voluntarily. ORS 426.100(1)(d). Given our disposition, we need not address that assignment. *But cf. State v. Bartel-Dawson*, 176 Or App 519, 31 P3d 1129 (2001) (rejecting similar argument on harmless error grounds, citing *State v. Cach*, 172 Or App 745, 750 n 4, 19 P3d 992, *rev den* 332 Or 316 (2001) (Kistler, J., majority) and 172 Or App at 754 (Edmonds, P. J., concurring)).

[7] ORS 426.005(1)(d) provides, in part:

" 'Mentally ill person' means a person who, because of a mental disorder, is one or more of the following:

"(A) Dangerous to self or others.

On appeal, the state contends, alternatively, that appellant is a danger to himself or unable to provide for his basic needs for two related reasons. First, the state contends that it is probable that, upon discharge, appellant would discontinue his medications which, given the uncertainty of appellant's plans, "could lead to his demise in an unstructured environment." Second, the state contends that it is also likely that, upon discharge, defendant will use illegal drugs, which will exacerbate his disorder—and would, in all events, be harmful.

■■  In assessing the state's contentions, we emphasize once again the properly limited function of involuntary civil commitment: "Unless a mental disorder has impaired autonomous choice, civil commitment cannot be a vehicle for 'saving people from themselves.'" *State v. Gjerde*, 147 Or App 187, 196, 935 P2d 1224 (1997). Consistently with that principle, the state's burden in "basic needs" commitment cases is rigorous, as we explained in *State v. Baxter*, 138 Or App 94, 906 P2d 849 (1995):

> "The state must show, that due to a mental disorder, appellant is 'unable to obtain some commodity (*e.g.*, food and water) or service (*e.g.*, life-saving medical care) without which he cannot sustain life.' The state must also show that the threat to appellant's survival is in the near future." 138 Or App at 97, *quoting State v. Bunting*, 112 Or App 143, 145, 826 P2d 1060 (1992) (internal citations omitted).

The state must make the requisite showing by "clear and convincing" evidence—that is, evidence of "extraordinary persuasiveness." *State v. Johnson*, 131 Or App 561, 564, 886 P2d 42 (1994). *See also State v. Jayne*, 174 Or App 74, 77-78, 23 P3d 990, *rev den* 332 Or 316 (2001) (describing "clear and convincing evidence" as establishing that the "truth of the facts asserted is highly probable").

Although we are loath to fact-match, given the idiosyncrasies of civil commitment cases, this case is so closely analogous to *Baxter* as to be controlled by our analysis and disposition there. In *Baxter*, an initial commitment case, the

---

"(B) Unable to provide for basic personal needs and is not receiving such care as is necessary for health or safety."

appellant, like the appellant here, was schizophrenic but denied his condition. Baxter "apparently lived on the streets most of the time" and took street drugs, including methamphetamine. 138 Or App at 96. He received Social Security disability benefits because of his mental condition and used those funds "for surviving." *Id.* Baxter had been previously hospitalized for his mental condition, and medication had been prescribed for that condition, but he stopped taking the medication "because he felt he did not need it." *Id.* After an episode in which Baxter had been hospitalized because of apparent physical problems following the discontinuation of his medication, the trial court determined that he was unable to care for his basic needs and ordered his involuntary commitment.

■    We reversed:

> "The state argues that schizophrenia is a life-threatening condition and that appellant fails to take his medication for that condition. In support of its argument, the state points out that appellant denies he has schizophrenia, refuses to take his medication, and self-medicates with street drugs for his perceived ailments.

> "The state's argument fails for two reasons. First, there is no medical evidence establishing that schizophrenia is *per se* life-threatening. Second, by itself, failing to take medication is not sufficient if it causes only a speculative threat. * * * Assuming that appellant will not take his medication, the state has still failed to prove any demonstrable consequences that would threaten appellant's survival in the near future. * * * Here, the state failed to produce sufficient evidence through expert or lay testimony that appellant, without medication, would revert to the behavior that he exhibited prior to his hospitalization. Also, the state failed to show that that previous behavior—hostility, lack of sleep, and use of drugs and alcohol—was so severe as to constitute a threat to his survival.

> "The state next argues that appellant was unable to meet his need for shelter. The state first emphasizes the lack of any parental support, implying that appellant will end up on the streets. Appellant plans to seek lodging from his mother. If that is not possible, he states that he can go to a shelter or 'camp out' if the weather is warm. Although the lack of certain shelter is not a good plan, we cannot say that

homelessness by itself is sufficient grounds for commit-ment." 138 Or App at 97-99 (footnote omitted; citations omitted).

Here, as in *Baxter*, the "worst case scenario" the state posits is that appellant, upon discharge, would discontinue his medication, indulge in substance abuse, and perhaps ultimately end up on the streets. As in *Baxter*, the state has adduced no proof that appellant's failure to take medication would be in any way life-threatening, much less in the near future. *See also State v. Blanding*, 174 Or App 238, 242, 23 P3d 436 (2001) (rejecting identical argument). Moreover, as in *Baxter*, the state's concerns about appellant's potential homelessness—even if that came to pass—are speculative. Indeed, as in *Baxter*, appellant here has outlined an entirely rational plan of renting an apartment and continuing his education with the Social Security benefits and trust income, the existence of which the state does not dispute. Further, although appellant's parents are apparently unwilling to have him return home, the record suggests that at least his father would support his efforts to rent an apartment in the area. We thus conclude that the state's evidence was insufficient to justify continuation of commitment based on appellant's alleged inability to provide for his basic needs.

■ The alternative, and closely related, "danger to self" ground for continued commitment fails for similar reasons. Beyond the considerations we addressed with respect to "basic needs," the alleged "danger to self" seems to pertain to appellant's potential consumption of alcohol and drug abuse. Two concerns, one general and one more precise, seem to underlie the state's argument. The more general concern is that alcohol and drug abuse can be harmful and that appellant does not appreciate the risks of such abuse. The difficulty with that argument is that the state has not established the requisite nexus between appellant's mental illness and the potential substance abuse or failure to appreciate the risks of such abuse. That is, nothing in this record demonstrates that appellant will abuse drugs or alcohol *because* of his mental condition or that his appreciation of those risks (or, conversely, his choice to engage in such abuse) has been materially impaired *because* of his mental illness. *See Gjerde*, 147 Or App at 192 ("[T]he state must prove a causal nexus

between the mental disorder and at least one of the ORS 426.005(1)(d) criteria.").

The second, and more precise, concern seems to be that, if appellant abuses drugs or alcohol while continuing to take his prescribed medications, the combination could be dangerous.[8] The only support in the record for this asserted danger is Axer's passing remark that "medication and alcohol could be a poisonous mixture." That single, unamplified comment was insufficient to constitute "clear and convincing" evidence warranting continuation of appellant's commitment on the ground that he was dangerous to himself.

The trial court erred in continuing appellant's commitment. Reversed.

---

[8] That argument, of course, presumes that appellant would continue to take his medications—while the state's other arguments contend that he would not.