6                 February 20, 2025                No. 115

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

In the Matter of S. G.,
a Person Alleged to have Mental Illness.

STATE OF OREGON,
*Respondent,*

*v.*

S. G.,
*Appellant.*

Multnomah County Circuit Court
22CC07581; A180330

Erin E. Kirkwood, Judge.

Argued and submitted January 10, 2024.

Liza Langford argued the cause and filed the brief for appellant.

Jona J. Maukonen, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Aoyagi, Presiding Judge, Egan, Judge, and Joyce, Judge.*

EGAN, J.

Affirmed.

_____
* Egan, J., *vice* Jacquot, J.

**EGAN, J.**

In this civil commitment case, appellant seeks reversal of a judgment committing him to the Oregon Health Authority for a period not to exceed 180 days based on the trial court's determination that appellant has a mental disorder that causes him to be a danger to himself. *See* ORS 426.130; ORS 426.005(1)(f)(A). Appellant assigns error to the trial court's finding that he was a danger to himself as a result of his mental disorder. He argues that the evidence was insufficient to show by clear and convincing evidence that his mental illness caused him to be a danger to himself. Relatedly, he contends that his dangerous behavior resulted from his substance use disorder, which does not qualify as a mental disorder, so the state could not prove that his dangerous behavior resulted from a mental disorder. The state argues that it presented legally sufficient evidence to support the trial court's finding that appellant's mental disorder caused him to be a danger to himself.[1] For the reasons explained below, we affirm.

## I.   STANDARD OF REVIEW

Appellant does not request that we review his case *de novo*, and this is not an exceptional case that justifies such review. *See* ORAP 5.40(8)(C) (providing that the court will exercise its discretion to review *de novo* "only in exceptional cases"). Therefore, "[w]e review whether the state presented sufficient evidence to support appellant's civil commitment for legal error and are bound by the trial court's factual findings that are supported by evidence in the record." *State v. C. M. C.*, 301 Or App 206, 207, 454 P3d 30 (2019). We state the facts in accordance with that standard.

## II.   FACTS

At the civil commitment hearing, the trial court heard evidence that appellant has a bipolar disorder; depression; a schizoaffective disorder that causes him to hear voices; and a substance use disorder that involves

---

[1] The state also argues that appellant failed to preserve his first assignment of error because he never specifically challenged the sufficiency of the evidence to support the determination that, because of his mental disorder, he was a danger to himself. However, we conclude that appellant's closing argument at the trial court, which cited various sufficiency-of-evidence cases, was sufficient to preserve this assignment of error.

consuming dangerously high amounts of coricidin, an over-the-counter cough medicine. Appellant testified that he takes coricidin as a recreational drug and that it is "what weed is to the rest of Oregon" because it keeps him "calm," "centered," and "makes [him] feel safe."

Appellant's use of coricidin resulted in overdosing four times in 2022: once in May, once in November, and twice in December. On December 3, appellant crossed a street and began stumbling through traffic because of the delayed onset effects of consuming coricidin. Video footage showed cars driving around appellant to avoid hitting him. A maintenance worker from appellant's apartment complex was able to call appellant back to the sidewalk and called 9-1-1, and appellant was admitted to the emergency department to be treated for an overdose. On December 8, appellant called 9-1-1 after ingesting five boxes of coricidin, which he testified was two and a half times more than his usual dosage. That overdose precipitated the proceedings in this case.

At the hospital, staff described appellant's thoughts as "grandiose" and "delusional" because he minimized the idea that his actions could be dangerous. The precommitment report shows that appellant told the precommitment investigator that he had only wanted to get high on December 8; however, the report also states that appellant told an EMS worker, who helped him on December 8, that he wanted to sleep and "not wake up."[2] When asked the pre-commitment investigator asked if he felt invincible, appellant responded, "Yes, I am the son of God. Even if I die, I can come back to life."

At the hearing, the state presented evidence regarding appellant's mental health history, substance use disorder, overdoses, hospitalizations, and suicidal ideation and attempts. Appellant has a history of five known suicidal-related episodes as of 2022, which included: in 2019, a suicide attempt by hanging himself with a belt; in February 2022, a hospitalization after cutting himself; in April 2022,

---

[2] At trial, appellant argued that the statement made to the EMS worker was hearsay. The trial court overruled appellant's hearsay objection. Appellant does not challenge that ruling on appeal.

a hospitalization after being disruptive at his apartment building, throwing objects out of a window, and standing on a ledge while threatening to commit suicide; and in March 2022, appellant was admitted into a hospital for mania and possible psychosis after he swallowed glass. The fifth episode was the December 8 overdose mentioned above, in which appellant took two and a half times his usual dose of coricidin. Appellant also had incidents where he impulsively ate inedible objects. During two incidents where he ate glass, he would crush glass—the size of a quarter—into powder with his molars and swallow it. He also testified to eating concrete twice.

Appellant testified about hearing voices, and when asked what role substance use had on his mental health, he answered, "It numbs me out, because sometimes, too many voices or too much depression \* \* \*. Where I get my high, it'll level out my mood. I have clarity." Appellant testified that he had taken five boxes of coricidin on December 8 because he wanted to know his "threshold," which he described as "the same sort of memory loss, some type of brain damage." He also testified that he would not push his threshold again because he understood "it's a dangerous place to be at, so [he'll] go back to what's [a] comfortable" dosage. Appellant also testified that he intended to continue taking coricidin once released from the hospital, but that he would only take two boxes at a time going forward.

Two mental health counselors, a treating hospital psychiatrist, and a mental health examiner also testified. Ms. Brown, a community-based mental health counselor who treated appellant from November 2021 until October 2022, testified that, several weeks prior to appellant's commitment—before the December 8 overdose—she had not been concerned for his well-being because he was compliant with his medication, he started to build a "support network at his apartment complex," and he "had a person that he could communicate with." She also testified that, although appellant was adamant to her about not being suicidal, she questioned that assertion because appellant's frequent hospital stays appeared to be the result of suicidal behavior.

Ms. Gordon, another mental health counselor, who frequently met with appellant at mindfulness groups and individually, testified that she was concerned for appellant's safety because he had repeated incidents of taking too much coricidin that caused him to be "out in the cold, unresponsive, or *** thrash[] around in his hallway, or go[] to the 7-11 and tell[] the clerks that *** he never want[ed] to wake up," so she believed appellant "might actually die." Ms. Gordon also testified that, although appellant's counseling records showed that he was "highly motivated to get medication and treatment," she was concerned that appellant's schizoaffective disorder caused him to hear voices, caused him internal distress, and led him to engage in dangerous behaviors that could result in harm.

The hospital psychiatrist, who met with appellant twice, testified that he did not think that appellant was an imminent danger to himself nor others but that his consumption of coricidin placed him at risk of having another overdose. He testified that consuming five boxes of coricidin could lead a person to become psychotic or delirious and then cause a coma or death. He could not say whether appellant's consumption of two boxes at a time was "acutely medically dangerous" because someone who frequently takes the medication will develop a tolerance.

The mental health examiner testified that appellant would do whatever was necessary to relieve his psychotic symptoms, including consuming concrete, glass, or large amounts of coricidin. The examiner testified that appellant had a high tolerance for coricidin, and although he did not intend to overdose, his need to keep pushing the threshold of how much he could handle made him a danger to self.

As a result, the trial court found that the state had met its burden and civilly committed appellant because appellant's mental disorders—bipolar and schizoaffective disorder—have caused appellant to engage in a pattern of dangerous activities, "lack [] insight into the dangerousness of his choices," and impulsively act upon his symptoms. The court found that, even though appellant denied being suicidal, his mental disorders cause him to engage in

"behaviors to relieve his pain that place him in harm's way, such as eating glass, eating concrete, and taking immense doses of [coricidin], high enough doses that disabled him in the middle of traffic most recently; but those medications, and the getting high to avoid that pain, could also lead to overdose and death."

The court did not find credible appellant's testimony that he would only take coricidin in manageable doses because the recent overdoses were not isolated incidents, but rather, part of appellant's pattern of engaging in dangerous activities in recent years—*viz.*, eating inedible objects, consuming high amounts of coricidin to the point of overdosing, suicidal episodes—and appellant "continue[d] to get high to manage the voices and other symptoms, some of which [were] the direct result of his mental disorder and some of which may [have been] driven by [his] trauma." Thus, the trial court determined that, based on the evidence, there was a "high probability that [appellant] [would] continue to engage in behaviors that place him in harm's way," and it ordered that he be civilly committed.

## III.  ANALYSIS

A.  *The trial court did not err in finding appellant was a danger to self.*

In appellant's first assignment of error, he argues that the trial court erred in committing him based on its finding that he was a danger to himself due to a mental disorder because any future prospect of harm was speculative. The trial court may involuntarily commit a person if it determines by clear and convincing evidence that the individual is a "person with a mental illness." ORS 426.130(1)(a) (C). A "person with a mental illness" includes someone who suffers from a "mental disorder," and, as a result of that disorder, is a danger to self. ORS 426.005(1)(f)(A). To prove an individual is a "danger to self," legally sufficient evidence must establish that "an individual's mental disorder *** cause[s] the individual to act in a way very likely to result in physical harm in the near future." *State v. C. C.*, 258 Or App 727, 731, 311 P3d 948 (2013) (citing *State v. T. R. O.*, 208 Or App 686, 691, 145 P3d 350 (2006)).

"[O]ur cases have uniformly imposed a rigorous threshold with respect to what the state is required to show to establish that an individual is '[d]angerous to self.'" *State v. B. B.*, 240 Or App 75, 82, 245 P3d 697 (2010). To meet that threshold, the threat of harm must involve "serious" and "actual" physical harm in the "near term." Id. Thus, the state meets its burden by showing that there is clear and convincing evidence that appellant's "mental disorder has resulted in harm to [him]self *** or created situations likely to result in harm." *State v. K. K. G.,* 267 Or App 319, 321, 340 P3d 735 (2014) (internal quotation marks and citation omitted). "Indeed, a number of our cases have suggested that the potential harm must be 'life-threatening' or involve some 'inherently dangerous' activity." *B. B.*, 240 Or App at 82-83 (quoting *State v. D. J.*, 206 Or App 146, 153, 135 P3d 397 (2006)).

"Although a person can be committed as dangerous to self before [they are] on the brink of death, the prospect of serious physical harm must be more than merely speculative." *State v. R. E.*, 248 Or App 481, 491, 273 P3d 341 (2012) (internal quotation marks and citation omitted)); *see State v. D. R.*, 183 Or App 520, 525, 52 P3d 1123 (2002) (holding that the appellant was not a danger to self, because wandering the streets while unmedicated had never resulted in injury; therefore, civil commitment did not "interrupt[ ] a sequence of events that ha[d], in the past, led to disaster"); *see also State v. D. P.*, 208 Or App 453, 465, 144 P3d 1044 (2006) (on *de novo* review, we reversed a judgment committing an appellant where there was "no evidence by which to evaluate the seriousness and imminence of th[e] threat [of self-harm]" beyond her recent admission that she wanted to harm herself).

In this case, the record supports the trial court's finding that appellant's mental disorders—bipolar disorder and schizoaffective disorder—caused him to suffer from mental pain and symptoms, including hearing voices, that lead him to engage in "behaviors to relieve his pain that place him in harm's way, such as eating glass, eating concrete, and taking immense doses of [coricidin], high enough doses that disabled him in the middle of traffic[,] *** [and]

the getting high to avoid that pain, could also lead to over-dose and death." Although, during the commitment hearing, appellant denied intending to harm himself by overdosing, the trial court found that he would continue to behave dan-gerously, explaining that appellant "continues to get high to manage the voices and other symptoms, some of which are the direct result of his mental disorder." We defer to the trial court's findings that are supported by the record. *C. M. C.*, 301 Or App at 207.

Further, there was a future prospect of serious phys-ical harm to appellant that was more than merely "specula-tive." There was evidence of suicidal episodes, coricidin use that had led to repeated overdoses, overdoses that had led to hospitalizations, and impulsively eating glass and con-crete. That evidence permitted the trial court to determine that appellant had demonstrated a pattern that had led to serious self-harm; therefore, the trial court had sufficient evidence to conclude that appellant faced a future prospect of serious physical harm. Appellant testified that he takes coricidin to "numb[] [himself] out, because sometimes [he hears] too many voices or [experiences] too much depres-sion[.]" And he testified that when he gets high, it "levels out" his mood and gives him "clarity." In other words, as the court found, appellant's mental disorder symptoms caused him to take coricidin, which had resulted in repeated over-doses and hospitalizations. Therefore, the trial court had sufficient evidence to conclude that civil commitment would "interrupt[] a sequence of events that ha[d], in the past, led to disaster"—*viz*., appellant eating glass and concrete; taking excessive amounts of coricidin; and overdosing and being hospitalized. *D. R*., 183 Or App at 525.

The trial court ultimately determined that, based on appellant's "lack of insight into the dangerousness of his choices," the pattern of his actions, and his impulsivity, there was a "high probability that [appellant] [would] continue to engage in behaviors that place him in harm's way." Based on those conclusions, which were supported by the evidence in the record, the trial court did not err in its civil commitment determination, because the record contained sufficient evi-dence to prove appellant's mental disorders caused him to

continue to engage in "life-threatening" or "inherently dangerous" activities that created a danger to self. *B. B.*, 240 Or App at 82-83.

B.  *The trial court did not err in finding that the state presented sufficient evidence to establish that appellant's mental disorder caused his danger to himself.*

Next, appellant argues that, even if he was a danger to himself due to his coricidin use, the state failed to prove the required nexus between his mental disorder and danger to self, because appellant stated that he takes coricidin for recreational use and to get high—rather than to relieve his mental disorder symptoms. Appellant argues that his substance use disorder is specifically omitted from the definition of chronic mental illness under ORS 426.495 and, consequently, the court erred in considering his use of coricidin in determining that he was a danger to himself.[3] As explained below, ORS 426.495 is not directly applicable. We begin with the question of whether the state proved the required causal nexus.

"[I]t is not sufficient for the state merely to prove that a person has a mental disorder and that the person is dangerous to [self] * * *. Rather, the state must prove a causal nexus between the mental disorder and" dangerousness to self or others or inability to meet basic needs. *State v. M. G.*, 147 Or App 187, 192, 935 P2d 1224 (1997). Conduct that is solely volitional—"that is, conduct that is engaged in as a result of a person's free, knowing, and rational choice—does not satisfy the requirement of a causal connection between dangerous behavior and the person's mental illness." *State v. R. D. G.*, 187 Or App 207, 218, 66 P3d 560, *rev den*, 335 Or 655 (2003) (internal quotation marks and citation omitted). But if the state establishes that the "allegedly mentally

---

[3] The state also argues that appellant did not preserve his second assignment of error because he failed to argue below about the trial court's discretion, and the state argues that appellant misstates the standard of review for this assignment. We conclude that appellant preserved this argument during his closing argument at the commitment hearing when he argued that "chronic mental illness refers to a mental disorder other than those caused by substance [use disorder]." However, we agree with the state that this assignment is mis-framed as having an abuse of discretion standard of review because there was no discretionary issue in this case. We apply the same standard of review as the first assignment of error.

ill person's volition is significantly impaired by the person's mental disorder," the requisite causal nexus is satisfied. *Id.*

In *State v. E. A. L.*, we concluded on *de novo* review that the state failed to establish the requisite nexus between the appellant's mental illness and the potential that his substance use disorder would result in a danger to self. 179 Or App 553, 561, 41 P3d 440 (2002). The appellant had been diagnosed with chronic paranoid schizophrenia and had a history of substance abuse, which included drinking alcohol and using illegal drugs. *Id.* at 556-57. He did not view himself as mentally ill and had been "grudgingly" compliant with medication. *Id.* at 557. On appeal, the state argued that the appellant was a danger to himself because it was probable that, upon discharge, he would discontinue taking his medications for his mental disorder and use illegal drugs, which would exacerbate his mental disorder and result in harm. *Id.* at 559. We summarized the state's general concern: that alcohol and drug use could be harmful, and the appellant did not appreciate the risks of such drug use. *Id.* at 561. We explained that the difficulty with that argument was that the state "ha[d] not established the requisite nexus between appellant's mental illness and the potential substance [use disorder] or failure to appreciate the risks of such [drug use]." *Id.* Nothing in the record had demonstrated that the appellant would "[use] drugs or alcohol *because* of his mental condition or that his appreciation of those risks (or, conversely, his choice to engage in such [drug use]) ha[d] been materially impaired *because* of his mental illness." *Id.* (Emphasis in original.) As a result, we concluded that the trial court erred in continuing the appellant's commitment. *Id.* at 562.

Here, by contrast, the trial court found that appellant's mental disorder symptoms caused him to be a danger to himself when it stated that appellant "continues to get high to manage the voices and other symptoms, some of which are the direct result of his mental disorder." The trial court also found that appellant had been "engaging in behaviors to relieve his *** traumatic pain and pain associated with his mental disorder"—such as "eating glass, eating concrete, and taking immense doses of [coricidin], high enough doses that disabled him in the middle of traffic."

We agree with appellant that his substance use disorder, alone, or the likelihood that it could result in a future harm would be insufficient to civilly commit him. However, as explained above, the trial court found, and the record supports, that his decisions to consume excessive amounts of coricidin were caused by his mental disorder. Given that, the court did not err in concluding that the required nexus existed.

Lastly, appellant argues that his substance use disorder cannot justify involuntary commitment under ORS 426.005 because ORS 426.495 specifically excludes substance use disorder from the definition of chronic mental illness. *See* ORS 426.495(1)(c)(B) (defining "[p]erson with a chronic mental illness" to include individuals "[d]iagnosed *** as having chronic schizophrenia, a chronic major affective disorder, a chronic paranoid disorder or another chronic psychotic mental disorder *other than those caused by substance abuse*" (emphasis added)). At trial, appellant argued that "regardless of how severe the substance [use] disorder is, or the likelihood that [it would] harm [] him in the future, it's simply not within the scope of things that a person can be committed for." The state argues that we should reject this argument because appellant was not committed on the ground that he was chronically mentally ill.

Appellant's commitment was based on a danger to self because of a mental disorder under ORS 426.005(1)(f)(A), not a chronic mental illness under ORS 426.495. The definitions under ORS 426.495 specifically apply to statutes under ORS 426.490 to 426.500. ORS 426.495(1). We recognize that the definition of a person with mental illness under ORS 426.005(1)(f)(C) incorporates the definition of a person with a chronic mental illness under ORS 426.495. ORS 426.005(1)(f)(C). Nevertheless, here, the court determined that appellant was a person with mental illness under ORS 426.005(1)(f)(A), not ORS 426.005(1)(f)(C). Thus, the definition of chronic mental illness is not directly applicable.

To the extent that, as appellant argues, the definition nevertheless suggests that the legislature did not intend mental issues caused by substance abuse to qualify as mental disorders—a question that we need not decide in this

case—the trial court's ruling in this case is consistent with that suggestion. Here, the evidence amply showed, and the trial court found, that appellant's diagnosed mental disorders—bipolar disorder and schizophrenia—caused, among other dangerous activities, his substance use. The definition of chronic mental illness that appellant relies on excludes mental disorders that are caused by substance abuse, not substance abuse that is caused by mental disorders. Thus, we conclude that the trial court did not err in committing appellant.

Affirmed.